**NEW LIFE BAPTIST CHURCH ACADEMY, et al., Plaintiffs,**

**v.**

**TOWN OF EAST LONGMEADOW, et al., Defendants.**

**Civ. A. No. 83–0580–W.**

United States District Court, D. Massachusetts.

July 27, 1987.

Richard G. Gay, Law Office of Richard G. Gay, Berkeley Springs, W.Va., for plaintiffs.

Thomas Kenefick, III, Cooley, Shair, Alpert, Labovitz & Dambrov P.C., Springfield, Mass., Maria I. Lopez, Asst. Atty. Gen., Civ. Rights Div., Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

WOLF, District Judge.

## I. INTRODUCTION

This case involves a conflict between members of a small church and school officials of a small town. Yet it raises issues concerning the separation of church and state which are as old and enduring as our nation itself. The case also presents important questions concerning the relative rights and roles of parents and the state with regard to educating children.

Massachusetts law requires that until age sixteen every child attend a public school or a private school approved by a local school committee. Massachusetts General Laws c. 76, § 1 ("M.G.L. c. 76, § 1"). A school committee must approve a private school when satisfied that the instruction in certain subjects equals in thoroughness, efficiency, and progress that in the public schools in the same town. *Id.*

Plaintiffs are the New Life Baptist Church ("New Life"), its minister, and some of its members. They are born again Christians whose religion obligates them to provide a school as a ministry of their church. Thus, they have established the New Life Academy in East Longmeadow, Massachusetts. It is plaintiffs' sincere religious belief that God is the ultimate sovereign of their church and to submit its educational ministry for approval by the state would be a sin.

Defendants are the entities and officials of the Town of East Longmeadow responsible for approving private schools pursuant to M.G.L. c. 76, § 1. Defendants informed New Life that it would have to submit its Academy for approval by the East Longmeadow School Committee; advised New Life of certain essential standards and procedures it would employ in deciding whether to approve the Academy; and warned plaintiffs that parents would be subject to possible prosecution if the New Life Academy was not approved and they continued to send their children to school there.

Initially New Life provided information to the East Longmeadow School Committee with a view to persuading the School Committee that approval of its Academy was unnecessary and inappropriate. It ultimately became evident, however, that the School Committee would continue to maintain that New Life would have to participate in the approval process, that the approval process would involve considerable surveillance of the school, and that approval was unlikely to be granted unless, at a minimum, the Academy employed more highly educated teachers. Believing that to seek approval would be a sin, and fearing that participating in the approval process would result in government control of New Life's educational ministry, plaintiffs initiated this action seeking to enjoin the defendants' effort to apply the approval requirements of M.G.L. c. 76, § 1 to New Life and requesting money damages.

■ When, as here, there is a conflict between individuals' constitutional rights to the free exercise of their religious beliefs and the state's compelling interest in assuring that children are adequately educated, the government must show that it is using the least restrictive means possible to satisfy its interest. Defendants have failed to demonstrate that the requirements they have sought to impose on plaintiffs are essential to assuring that the children involved in this case will be adequately educated. Rather, the evidence demonstrates that relying upon either standardized testing and appropriate individual follow-up, or such testing, follow-up and a requirement that each teacher have appropriate academic credentials, is a less burdensome means of satisfying the state's interest. Thus, the defendants' conduct in this case violates plaintiffs' rights under the Free Exercise Clause of the First

Amendment of the United States Constitution.

More specifically, with regard to the Free Exercise Clause issue, plaintiffs' primary contention at trial was that reliance on the results of standardized tests and individual follow-up in appropriate cases is a less restrictive, effective means of assuring that New Life students are adequately educated. Defendants disputed the claim, primarily asserting that every element of East Longmeadow's approval process is essential to serving the state's compelling interest in the education of New Life students. However, East Longmeadow's final expert witness, Dr. Kevin Ryan, testified that the East Longmeadow approval process was not the only acceptable means of satisfying the government's interest in the education of New Life students. Rather, he said, reliance on standardized test results and individual follow-up, coupled with a requirement that teachers have college degrees, would suffice.

Although some witnesses who preceded Dr. Ryan testified briefly on the importance of teachers having college degrees or other academic credentials indicating preparation to teach, the record was not fully developed on this issue. Since the trial of this case, the Massachusetts Supreme Judicial Court has indicated that approval of home education should be subject to the same standards as private school approval and has decided that with regard to approving home education the state may inquire into academic credentials, but not require that parents who teach have college degrees. *Care and Protection of Charles & Others*, 399 Mass. 324, 331, 339, 504 N.E.2d 592 (1987). It is not, however, necessary or appropriate for this court to decide now whether an academic credential requirement is a component of the least restrictive means of assuring that New Life students are adequately educated. The ultimate relevant Free Exercise Clause question is whether defendants have proved that the East Longmeadow approval process is the least restrictive means of satisfying the state's interest in the education of New Life students. For the reasons described in this opinion, East Longmeadow has failed to make this showing. Rather, the evidence demonstrates that either standardized testing and individual follow-up or such testing, follow-up and a requirement that each teacher have appropriate academic credentials is a less burdensome means of satisfying the state's interest than the East Longmeadow approval process. Thus, the court finds that defendants' conduct violates the Free Exercise Clause.

Similarly, government action relating to religion must not foster an excessive entanglement with religion. The means by which the defendants have sought to apply the relevant statute to New Life in this case would create an excessive entanglement with religion. Thus, defendants' conduct also violates the Establishment Clause of the First Amendment of the United States Constitution. In contrast, the less restrictive alternative means which the state could employ to assure that New Life students are adequately educated would not violate the Establishment Clause.

In view of the foregoing, the defendants are permanently enjoined from applying to New Life the approval process at issue in this case. They are also enjoined from prosecuting the plaintiff parent for failing to send his child to an approved school. The question of a possible award of money damages remains to be decided.

The findings of fact and legal analysis on which these conclusions are based are described in detail in this opinion. It is important to recognize, however, that although this opinion decides, subject to possible judicial review, the legality of specific conduct, it does not eliminate the competing, compelling concerns of each of the parties or decide the precise parameters of a constitutionally permissible reconciliation of those interests. Thus, continued interaction between the parties is required.

It remains necessary for defendants to determine in light of this decision how they will attempt to satisfy in a constitutionally acceptable manner the state's important interest in assuring that the children who attend New Life Academy are adequately

educated. The plaintiffs will have to respond to defendants' renewed efforts to discharge their responsibilities. If the parties proceed in the spirit of tolerance and respect for the integrity of each others' views which inspired the First Amendment, a mutually acceptable accommodation should be attainable. In the absence of such an effort, further litigation may be inevitable.

## II. FINDINGS OF FACT

### 1. *The Statutory Context of the Case*

This case is generated, in part, by the existence of certain laws of the Commonwealth of Massachusetts. Massachusetts law requires that each child attend school until age sixteen. M.G.L. c. 76, § 1[1]. To satisfy this requirement a child must attend a public school or a private school approved by a local school committee. *Id.* A school committee must approve a private school when satisfied that "the instruction in all the studies required by law equals in thoroughness and efficiency, and the progress made therein, that in the public schools of the same town." *Id.* The studies required by law are: orthography, reading, writing, the English language and grammar, geography, arithmetic, drawing, music, the history and Constitution of the United States, the duties of citizenship, health education, and good behavior. M.G.L. c. 71, § 1.

Parents who fail to send their children to a public school or an approved private school for the one hundred and eighty days required by the state's board of education are subject to possible criminal penalties.

M.G.L. c. 76, § 2[2] The parties have stipulated that this truancy statute has been enforced against fundamentalist Christian parents who have failed to comply with the compulsory education requirements of M.G.L. c. 76, § 1. In addition, any person, including a school committee, alleging that a child under age sixteen is not receiving proper educational care may initiate a civil proceeding which could result in an order removing a child from his parents or directing a specific form of education for the child. M.G.L. c. 119, § 24. This statute too has been enforced against fundamentalist Christian parents who failed to comply with M.G.L. c. 76, § 1. *See Care and Protection of Charles & Others*, 339 Mass. at 324, 504 N.E.2d 592.

### 2. *The Parties*

Plaintiff New Life Baptist Church is a fundamentalist Baptist church which opened in East Longmeadow, Massachusetts in 1977.

Plaintiff David C. Chase is the pastor of New Life Church and the principal of New Life Academy. He has no formal training in the education of children, but was an electronics instructor in the United States Navy for many years. Although he graduated from high school, he is not a college graduate. He is now working toward a Bachelor of Arts degree in Biblical Studies.

Plaintiff Richard Romero is the step-father of plaintiff Johna Opsitnik, a former New Life student, and of her sister, a present New Life student. He enrolled Johna in New Life because he was disappointed with her progress in the Chico-

---

**1.** M.G.L. c. 76 § 1 provides in pertinent part that:

> Every child between the minimum and maximum ages established for school attendance by the board of education ... shall ... attend a public day school in said town, or some other day school approved by the school committee, during the number of days required by the board of education in each school year ... but such attendance shall not be required ... of a child who is being otherwise instructed in a manner approved in advance by the superintendent of the school committee.... For the purposes of this section, school committees shall approve a private school when satisfied that the instruction in all the studies

required by law equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town; but shall not withhold such approval on account of religious teaching.

The parties have stipulated that sixteen is the maximum age established for school attendance.

**2.** M.G.L. c. 76, § 2 provides:

> Every person in control of a child described in the preceding section shall cause him to attend school as therein required, and if he fails so to do ... he shall ... be punished by a fine of not more than twenty dollars.

pee, Massachusetts public schools; he was not then a born again Christian. Mr. Romero has sued individually, as a member of New Life, and as a parent of New Life students.

Johna Opsitnik was a student at New Life until 1986. Following her graduation she briefly attended a Christian college, which she left to marry another New Life graduate then serving in the United States Air Force. The parties have stipulated that Ms. Opsitnik's claims have not been mooted by her graduation.

The defendants are the Town of East Longmeadow, the East Longmeadow School Committee, the members of the East Longmeadow School Committee, Dr. Wayne S. Porter, who was superintendent of the East Longmeadow Public Schools until his retirement in 1984, and Dr. John S. Drinkwater, Dr. Porter's successor.

The parties stipulated to certain facts relating to plaintiffs. Plaintiffs are born again Christians who share certain fundamental religious beliefs,[3] including the following.

Plaintiffs believe that the Holy Scripture is the infallible word of God. In observance of the commandments of the Bible, the New Life Baptist Church operates ministries to spread the gospel message of the salvation of man through Jesus Christ.

Plaintiffs believe that parents are required by their religion to educate their children to share their faith. They also believe that they are obligated by God to provide as an indispensable ministry of their church a school which teaches their religious beliefs. For plaintiffs, the secular and religious aspects of education are inseparable. Thus, in its educational ministry, New Life teaches all subjects from a biblical and Christian view of the world. Plaintiffs believe they are forbidden to send their children to schools, such as public schools, which they believe teach doctrines contrary to the Holy Scriptures.

Plaintiffs also believe that God is the sovereign and the final authority in all human conduct. It is plaintiffs' sincerely held religious belief that to submit their educational ministry for the prior or continued approval of secular authorities would violate the sovereignty of Christ over his church and would, therefore, be a sin.

### 3. *The Background of The Case*

In August, 1981, The New Life Baptist Church established the New Life Academy to perform its educational ministry. Dr. Porter, the superintendent of the East Longmeadow public schools, later learned of the existence of the Academy. On September 9, 1982, Dr. Porter wrote Pastor Chase a letter stating that:

> The East Longmeadow School Committee is required by law, M.G.L. c. 76, § 1 to approve private schools.... Until the school is approved by the school committee children attending are violating the compulsory attendance law so it is urgent that your school be sanctioned soon by the East Longmeadow School Committee.

He enclosed a "checklist for approval" that inquired about the school's philosophy and objectives, physical plant, safety, curriculum, educational materials, staff, administration, record keeping, student services, and financial support for the educational program.

Later that month, Pastor Chase met with Dr. Porter to discuss Dr. Porter's letter. Pastor Chase said that he did not wish to seek approval, but did want to cooperate. Pastor Chase's goal was to provide information sufficient to persuade East Longmeadow that the application of its approval process to New Life was unnecessary and inappropriate. Pastor Chase explained that he found some aspects of Dr. Porter's request to be confusing. Dr. Porter agreed and undertook to consult with state education authorities with a view to refining the request to New Life.

---

**3.** Johna Opsitnik's beliefs and desires have been expressed and are shared by her step-father, Mr. Romero. Thus, this case does not require resolution of a conflict between a parent and child regarding the child's education. *See Wisconsin v. Yoder,* 406 U.S. 205, 231, 242, 92 S.Ct. 1526, 1541, 1546, 32 L.Ed.2d 15 (1972).

On October 19, 1982, Dr. Porter wrote again to Pastor Chase, asking him to respond to twelve questions. These included requests for information regarding subjects offered by grade level; school hours and the number of days school was held; the school's qualification standards for teachers and staff and whether the teachers and staff met those standards; whether the school taught all legally required subjects; whether the school conformed to all health and safety standards; and whether the school was open to students of all races and religions.

On November 24, 1982, Pastor Chase responded to Dr. Porter's October 19, 1982 letter. After stating that, "[w]e have never sought the approval of any of our church ministries by non-religious organizations ...," Pastor Chase proceeded to furnish all of the information requested by Dr. Porter. This response was part of a continuing effort by Pastor Chase to accommodate the School Committee's concern without compromising his religious convictions. Among other things, Pastor Chase informed Dr. Porter that New Life Academy was open one hundred and seventy-five days each year. He also furnished the requested identification of the students attending New Life and indicated that the school building complied with all health and safety standards.

With regard to teachers, Pastor Chase wrote to Dr. Porter that they were required to be born again; to be a member in good standing of New Life Baptist Church; to have a deep love for children; and to have the educational background to teach the necessary subjects. Pastor Chase represented that all of New Life's staff were qualified under these criteria.

Pastor Chase's response was not sufficient to satisfy Dr. Porter. On January 20, 1983, Dr. Porter wrote Pastor Chase again. In his letter, Dr. Porter pointed out that Massachusetts required that schools be operated one hundred and eighty days each year and, therefore, that New Life's school year was five days short. He also asked for additional information regarding the educational background of the New Life teachers, including their degree status, major and minor, and teaching and related experience. Dr. Porter also requested a further explanation of the New Life curriculum and asked for an opportunity to visit New Life with members of his staff to review the school's curriculum materials and observe the teachers.

At this point, Pastor Chase apparently concluded that he would not succeed in his effort to persuade the School Committee that it was unnecessary and inappropriate to require that New Life seek approval. It was also then foreseeable that if the approval process continued New Life would not obtain approval unless, at a minimum, it upgraded the educational qualifications of its teachers, because during the 1982–1983 school year only three of the New Life Academy's eight or nine teachers were college graduates. It was also then foreseeable that the School Committee would require other reforms before approving New Life.

Following Dr. Porter's January 20, 1983 letter, plaintiffs joined with several churches of like faith and their members to initiate this litigation. On March 7, 1983, they filed suit against the organizations and officials of East Longmeadow responsible for education and their counterparts in other towns.[4] In this action plaintiffs

4. The original plaintiffs were several fundamentalist Christian churches and their members, including the Braintree Temple Academy in Holbrook, Massachusetts. Defendants were the counterparts of the East Longmeadow defendants in certain other communities, including the City of Boston, which was seeking to enforce the Massachusetts truancy statute against Boston residents who sent their children to the Braintree Temple Academy. In response to pretrial motions, the court dismissed the action as against several defendants. The case was also

dismissed against the City of Boston defendants as part of a stipulation providing that they would not seek to enforce the Massachusetts truancy law against any resident of the City of Boston who was the parent of a Braintree Temple Academy student until this case is finally adjudicated.

The sole remaining parties were the New Life plaintiffs and the East Longmeadow defendants. They each waived their right to a jury trial. This case was, therefore, tried to this court.

seek a declaration that M.G.L. c. 76, § 1, as East Longmeadow has sought to apply it to plaintiffs, violates the United States Constitution; an injunction against such application of the statute against plaintiffs; money damages for violation of plaintiffs' civil rights; and attorney's fees.

On March 9, 1983, Pastor Chase wrote again to Dr. Porter, stating in part:

I trust you will forgive the delay in answering your letter of January 20, 1983. So much has been happening and going on these past few weeks. Due to the nature of the school situation in Massachusetts, I was instructed by Council [sic] to refrain from answering until after a suit had been filed in the courts. Such suit was filed in Federal District Court in Boston on March 7.

I want to assure you again, Dr. Porter, and the School Board, we are not trying to hide anything, nor be evasive. As I mentioned in my last letter, I reaffirm now, we have not in the past nor do we in the future have any desire for an outside organization to approve any of our church ministries. You are welcome to visit at anytime. I would simply ask a day or two notice. My schedule is extremely busy and I would like to give you the time you need.

On June 13, 1983, Dr. Porter replied to Pastor Chase by writing:

I have not pursued the matter of School Committee approval for the New Life Baptist Church as I did not wish to make an issue of the matter hoping that we can come to some understanding. The matter of seeking approval rests with you and your associates. If you expect the School Committee to approve the New Life Baptist Church School as required under Mass. G.L. Ch. 76, Sec. 1, you must request approval and submit detailed information on the organization of the school, courses offered at each level, the number and educational qualifications of staff, show a 180 school day calendar year with basic annual hourly requirements, curriculum outlines for each grade and subject, titles and publishers of text books used in each grade

and subject area, and a master schedule showing teacher assignments, daily classes scheduled with special provision for laboratory sciences.

Unless you take the steps for approval soon, by early August, I will have to recommend that the School Committee refer this matter to Town Counsel for legal proceedings. Please understand that the School Committee has taken an oath to uphold the laws of the Commonwealth of Massachusetts, and they must see that private schools in East Longmeadow operate legally. You can expect the School Committee to be reasonable in their determination of the adequacy of the provision of education by the New Life Baptist Church School. I shall await an answer from you soon.

All further communications between the parties have been in the context of this litigation.

4. *The East Longmeadow Approval Process*

As indicated earlier, the court in this case is required to decide, among other things, whether the approval process which was being implemented on behalf of the East Longmeadow School Committee was the least restrictive means necessary to satisfy Massachusetts' compelling interest in assuring that the students attending New Life Academy are adequately educated and whether that process fosters an excessive entanglement between the government and religion. The essential characteristics of the standards and procedures that East Longmeadow has sought to apply to New Life, and similarly situated schools, include the following:

(1) The private school must make a request for approval. Dr. Porter's communications with Pastor Chase made this plain. Dr. Drinkwater's written "Private School Approval Process" reiterated that a private school would be required to submit certain information "accompanied by a request for approval." At trial, Dr. Drinkwater did suggest that if a private school fully participated in the approval process, but had religious objections to saying that it was seeking or accepting approval, he would

not recommend that it be required to state it was seeking or accepting approval. As discussed in the Conclusions of Law, this testimony does not operate to alter the approval process litigated in this case. Nor would such an alteration alone cure the constitutional infirmities of defendants' conduct.

(2) The private school must provide information concerning the curriculum; the school hours and number of school days; the identity of the pupils; the qualifications of the teachers; compliance with anti-discrimination laws; and conformity of the building with health and safety standards.

(3) Teachers must have college degrees, although if there were a small number studying for college degrees not yet earned, approval might be attainable.

(4) The subjects required by Massachusetts law must be taught. Instructional materials must be reviewed by East Longmeadow officials to assure that they cover the legally required subjects in a thorough and efficient manner.

(5) During the second year of a school's operation, East Longmeadow school officials must visit the private school to discuss the curriculum, review instructional materials, and observe classes being taught. If the officials were immediately satisfied with the adequacy of instruction, a single visit might suffice. If, however, East Longmeadow could not as a legal or practical matter rely on the college degrees of the teachers, its officials would have to go into classrooms on a frequent basis to observe actual teaching. In addition, if the representatives of East Longmeadow perceived deficiencies in a school's program, they would inform the school of their concerns and offer advice and assistance to achieve improvements in instruction. The School Committee's final judgment on whether to grant approval would depend in part on how well the school responded to its criticisms and suggestions.

(6) The initial approval process would, if successful, take about two years. An approved private school's right to continued approval would be reviewed every two years.

## 5. *The Burden on the Free Exercise of Plaintiffs' Religious Beliefs*

The plaintiffs' refusal to participate in the East Longmeadow approval process has been motivated primarily by their sincere religious beliefs. Plaintiffs may also be influenced by a recognition that approval of New Life Academy as currently constituted would be unlikely. Rather, it is foreseeable that New Life would have to adopt reforms required by East Longmeadow to obtain approval. However, as explained below, the court finds that plaintiffs would for religious reasons refuse to participate in the East Longmeadow approval process even if it were evident that their Academy would be approved without any alteration.

As indicated earlier, it is plaintiffs' sincere religious belief that it would be a sin inviting God's judgment to acknowledge that the government has the authority to approve or disapprove the educational ministry of their church. To them, participating in the current approval process would constitute the sin of subordinating God to the authority of the state. East Longmeadow's requirement that New Life request approval is to plaintiffs a civil compulsion to commit a sin. Compelling plaintiffs to sin burdens the free exercise of their religion.

In addition, the plaintiffs would for religious reasons refuse to submit New Life Academy for approval by the East Longmeadow School Committee even if approval was likely to be easily obtained. This conclusion is based on plaintiffs' testimony and reinforced by the testimony of Pastor Joseph A. Henry of the First Baptist Church of East Longmeadow.

First Baptist and New Life are each fundamentalist separatist churches. First Baptist initially participated in the process East Longmeadow was using to evaluate First Baptist's educational ministry for approval. First Baptist employs only college-educated teachers. As the approval process approached its conclusion, it appeared that First Baptist met all of the School Commit-

tee's requirements. Yet, Pastor Henry withdrew First Baptist from consideration because, as he focused on the issue, he concluded that to participate in a process which would result in approval would be to recognize the state's authority over his church's ministry by, in effect, asking permission of the state to carry on its religiously required educational ministry. While he continued to be willing to cooperate by providing information to the School Committee, he concluded it would be a sin to participate in an approval process.

The East Longmeadow approval process would also burden the free exercise of plaintiffs' religious beliefs in a way unlikely to be experienced by Pastor Henry and the First Baptist Church. Pastor Henry and plaintiffs share a concern that the potential, practical effect of allowing the state to approve their educational ministries would be to allow the state to control aspects of it. It appears that this fear would be realized if New Life engaged in East Longmeadow's approval process. Few of New Life's teachers are college-educated.[5] This is a matter of considerable, understandable concern to the East Longmeadow School Committee.[6] It appears, at

a minimum, that the School Committee would require that New Life employ virtually all college-trained teachers before approving its Academy. This would require the replacement of many of New Life's current teachers.

Pastor Chase testified that when he needs to obtain teachers for New Life, he prays for God to send them. College graduates who meet New Life's other criteria are available.[7] Although subject to economic constraints, plaintiffs have no religious objection to employing such college graduates. They sincerely believe, however, that it would be a sin to allow the government to dictate who New Life may or may not employ in its educational ministry because, once again, they would be compromising the sovereignty of God by submitting the church to the authority of the state.[8]

Finally, the East Longmeadow approval process burdens the free exercise of plaintiffs' religion by placing them in a position where they feel they must choose between obeying God or the state, and run the risk of retribution by the authority they decide to disobey. This has had injurious physical

---

**5.** During the 1981–82 school year, the New Life Academy had five teachers, none of whom had college degrees. During the 1982–83 school year, the New Life Academy had eight or nine teachers, three of whom were college graduates. During the 1984–85 school year, the New Life Academy had fifteen teachers, four of whom were college graduates. During the 1985–86 school year, the New Life Academy had fifteen teachers, four of whom were college graduates. Currently, the New Life Academy has fifteen teachers, six of whom are college graduates. Pastor Chase also lacks a college degree.

**6.** Only two teachers testified. Neither had college degrees. The teacher who taught seventh and eighth grade math, science, and geography was a high school graduate who had been a hairdresser. She demonstrated a familiarity with how to teach basic math operations, but she did not know where Nicaragua or Afghanistan were located. Although she had taught current events in the past, she did not know the name of the leader of Iran. She also thought Bohr's theory of atomic structure was a theory about a miniature solar system. This witness was very nervous and this may have contributed to her inability to respond correctly to some questions.

The other teacher who testified taught kindergarten. She was a high school graduate who had been an assistant manager of retail stores. She displayed a working knowledge of the lessons she would have to teach, but no familiarity with the literature of child development. For example, she had never heard of Piaget or Montessori. Nevertheless, the previous year when she taught third grade, she had recognized that a student had a learning disability. Standardized tests revealed the problem and, as a result, the teacher initiated appropriate follow-up.

**7.** Pastor Chase testified that he has turned down five college-trained applicants for teaching positions because he did not have openings for them.

**8.** Plaintiffs testified that they anticipated that submission of New Life to the approval process would result in the imposition by East Longmeadow of other requirements, such as the banning of prayer and the teaching of evolution. The evidence did not, however, indicate that these anticipated effects were likely to occur. The court has not given any weight to plaintiffs' misconceptions in deciding that the East Longmeadow approval process would burden the free exercise of their religion.

and psychological effects on the individual plaintiffs.

The difficult choice presented to the individual plaintiffs by the requirement that New Life seek and obtain approval also threatens the viability of the fledgling church. Present and potential members of New Life believe the church must provide a school to perform its educational ministry. The church is likely to lose some members if it does not offer a school. It is also likely to lose some members if parents are threatened with prosecution because their children attend a school which has not been approved. This is a burden on the plaintiff New Life Baptist Church.

The East Longmeadow approval process does not, however, threaten plaintiffs' way of life. In contrast to the Amish, for example, plaintiffs' religion does not require them to live apart from society. While they believe their church must be insulated from government influence—and thus would not accept any form of government funding—plaintiffs seek to educate their children to practice their religion as productive workers and effective citizens in American society, rather than isolated from it.

Plaintiffs' religious beliefs also do not prevent them from satisfying at least some of the School Committee's concerns. For example, New Life's school building meets Massachusetts health and safety requirements. Members of the church are concerned for the safety of their children and are anxious to assure that their school building meets legal safety standards. They allow public officials to inspect the premises and issue required permits. They do not believe this compromises the sovereignty of God because, to them, the church is the members and their ministries, not the building they occupy. Thus, they do not believe that submitting their building for approval constitutes submitting their church for approval.

In addition, after Dr. Porter informed Pastor Chase that state law required that schools be open one hundred and eighty days per year, New Life extended its school year to one hundred and eighty days. Pastor Chase testified at his deposition that this change was made to comply with state law. At trial Pastor Chase explained that this represented a voluntary decision to comply with state law and, in any event, did not in his mind present an issue of state control or approval of New Life's educational ministry.[9]

Plaintiffs' religious convictions do not prevent them from cooperating with secular authorities in other ways which are relevant to this case. Indeed, plaintiffs believe that they are commanded to obey civil law unless it conflicts with God's requirements.

Plaintiffs have expressed no religious objection to teaching all of the subjects required by Massachusetts law and have been doing so, although the quality and thoroughness of that instruction is seriously disputed. Plaintiffs also remain willing to provide all of the information requested by Dr. Porter and Dr. Drinkwater, but not for the purpose of attempting to obtain approval of New Life. Plaintiffs are, therefore, willing to disclose the identities of New Life students; describe the New Life curriculum in a manner which would indicate that the appropriate subjects are being taught; and disclose the educational qualifications of their teachers.

---

**9.** Nor has New Life's religious objection to seeking secular approval prevented New Life from being incorporated under Massachusetts law. Pastor Chase's testimony suggested that he had not fully understood the process of incorporation or its possible religious implications.

Generally, plaintiff's religious beliefs regarding the relationship of church and state are not fully developed or entirely consistent. Nor are those beliefs identical to those of other fundamentalist Christians and their churches, some of whom seek and accept secular approval for their schools. Differences in the application of their faith on such subjects is permitted by the fundamentalist Christian church's congregational structure. Fundamentalist Christian churches share certain assumptions and beliefs, but each congregation must ultimately decide its own position on other scriptural questions, such as whether to seek approval for their schools. The court is persuaded that plaintiffs' interpretation of their faith, and their differences with some other fundamental Christians, are based on plaintiffs' sincere religious convictions.

6. *Plaintiffs' Proposal for Satisfying the State's Compelling Interest in the Education of New Life Students*

Plaintiffs recognize that the state has an important, legitimate interest in assuring that all students, including those whose families are members of New Life, are adequately educated. It is their view, however, that the East Longmeadow approval process is not necessary to provide the state with this assurance. Rather, they contend that the use of standardized tests, in conjunction with personal follow-up in appropriate cases, will assure that New Life students are progressing in learning efficiently and thoroughly the subjects in which the state is interested.

Plaintiffs have no religious objection to New Life students taking standardized tests. They are also willing to have the test scores for each New Life student submitted to the School Committee, preferably by the parents rather than New Life, as long as this is not done as part of an attempt to obtain approval for New Life.

The parents are willing to submit the test scores. They are also willing to participate in subsequent meetings with public officials when test scores suggest this is desirable in order to discuss the scores, educational difficulties a child may have, and ways to remedy such difficulties. The faculty and staff of New Life would also be available to participate in such discussions.

Plaintiffs assert that the process they propose as an alternative to the East Longmeadow approval process would achieve results which would satisfy the state's reasonable concerns regarding the education of their children. For example, in at least one case standardized tests and subsequent efforts indicated that a New Life student had a learning disability. As a result, his parents transferred him to a public school for learning disabled children.

Plaintiffs assert that the alternative means of assuring that New Life students are adequately educated which they propose would not burden the free exercise of their religious beliefs. Nor, they say, would it excessively entangle the government and their church.

7. *The Expert Testimony*

The parties introduced considerable evidence regarding the value of standardized testing in meeting the state's interest in assuring that children are adequately educated generally and the sufficiency of plaintiffs' foregoing alternative particularly.

Plaintiffs presented the testimony of Dr. Cecil Reynolds, an expert in educational testing. As Dr. Reynolds and defendants' experts agreed, there are two widely accepted types of standardized educational tests. One type is a norm-referenced test which compares a student's performance to that of other students in a reference group who have taken the test. This type of test permits one fourth grader, for example, to be compared with other fourth graders across the country or in an another school. The second familiar form of standardized test is the criterion-referenced test. A criterion-referenced test measures whether a student has mastered a certain skill, such as long division. Criterion-referenced tests are designed to measure individual abilities, not to provide comparisons with other students.

Dr. Reynolds and defendants' experts also agreed that standardized tests are used in connection with important educational decisions throughout the United States. Massachusetts recently adopted a program of periodic administration of criterion-referenced tests to determine whether all students are adequately acquiring basic skills in reading, writing, and mathematics. M.G.L. c. 188 (1985). Standardized tests are also used in measuring teacher effectiveness and comparing school districts.

The Stanford Achievement Test, which has been administered by New Life since the inception of this case, is a nationally recognized norm-referenced test. According to Dr. Reynolds, it is common for a school district to have standardized tests specially devised to complement commercially available tests to measure fully mat-

ters such as the efficiency, thoroughness and progress of an educational program.

In Dr. Reynold's view, standardized criterion and norm-referenced tests either exist or could be developed to allow East Longmeadow to determine whether students at New Life were adequately acquiring the skills and knowledge necessary to become productive workers and effective citizens. Indeed, a number of states now rely on the results of standardized tests in assessing the adequacy of the education of students attending private religious schools or being educated at home. *See* Alaska Stat. § 14.-45.120; Ark.Stat.Ann. § 80–1503.6(3); Fla. Stat.Ann. § 232.02; La.Rev.Stat.Ann. § 17.236.1 D.(2); N.C.Gen.Stat. § 115C–549; W.Va.Code § 18–28–3.

Dr. Reynolds' conclusion that a combination of criterion and norm-referenced tests either exist or could be devised to measure whether New Life students are acquiring appropriate skills and knowledge derives in part from his view that a state's legitimate interest is in assessing what students know, rather than where they learned.

Dr. Reynolds also testified, however, that standardized test results are the best measure of teacher effectiveness. In his view, a college degree is not an essential requirement for either elementary or secondary school teachers.

Dr. Reynolds acknowledged that integrity in the testing procedures is required for the results to have the value he ascribes to them. He believes such integrity can be attained in the testing of New Life students.

Dr. Reynolds did not contend that test results alone would always satisfy the state's interest in assuring that a child was acquiring essential skills and knowledge. If test results raised a question concerning this, one or more meetings between School Committee representatives, parents and perhaps teachers would be necessary to identify the source of the child's problem. To accomplish this, further specialized testing might be required. If this process indicated that a student or group of students were having problems because they were not being adequately taught at school, the public officials could encourage the parents to seek improved education for their children, either by causing improvement of the child's current school or by transferring the child to another school.

Dr. Reynolds felt most parents, including most fundamentalist Christian parents, would be responsive to legitimate expressions about the adequacy of their child's education. If they were not, the state could initiate legal proceedings to compel appropriate education of the child.

Defendants presented several witnesses who testified concerning standardized testing and the sufficiency of plaintiffs' proposal for assuring that New Life students were learning adequately. Dr. Porter acknowledged that standardized test scores are a very important measurement of whether or not children are in fact being educated. Such tests are used in the East Longmeadow public schools to evaluate teaching, to improve the curriculum, and to see if the students are being taught certain subjects and developing certain skills. Dr. Porter views the purpose of education to be to impart knowledge to students. To him, standardized testing is a way to determine if this is being done.

Dr. Porter also testifed that a school must have competent teachers. With regard to teacher qualifications, Dr. Porter felt that a college degree was generally required, but that for a religious school some comparable training, not resulting in a college degree, might be acceptable for elementary school instructors. Dr. Porter himself had been taught in Catholic parochial schools by some instructors who did not have college degrees. In Dr. Porter's view, however, college educated teachers are more important now than when he was young, and indispensable for teachers in post-elementary education. He would not have recommended approval of New Life as long as it employed its staff as of March 1985, which included few teachers with college degrees.

Dr. Drinkwater testified that in his opinion every aspect of the East Longmeadow approval process described earlier would be essential to his deciding whether to recom-

mend that the School Committee approve New Life. In view of M.G.L. c. 76, § 1, Dr. Drinkwater believes it is his job to participate in deciding whether a school should be approved. He does not believe he is required to assess the progress of individual students.

Dr. Drinkwater did acknowledge that if certain criterion-referenced tests were properly administered, they would inform him of whether the subjects tested were being taught at New Life. Moreover, he testified that if those tests were properly administered, the results would also disclose whether those subjects were being taught as efficiently and thoroughly at New Life as in the East Longmeadow public schools.[10] Periodic testing employing proper procedures would also, in Dr. Drinkwater's opinion, disclose whether students at New Life were making progress in the subjects tested which is equivalent to the progress made in those subjects by East Longmeadow public school students.

Dr. Drinkwater does not, however, believe that he could rely on standardized test results to decide whether to recommend approval of New Life. He expressed concern about the integrity of the testing procedures employed by New Life. He also had a more fundamental concern. To Dr. Drinkwater, an essential purpose of education is to instill in children a "thirst for knowledge" and the reasoning skills to satisfy that thirst. Dr. Drinkwater believes that to impart those qualities an instructional program must have quality, college-educated teachers and a good curriculum. In his view, the results of standardized tests do not provide the information necessary to evalute an educational program. Thus, he believes every aspect of the previously described East Longmeadow approval process is indispensable to fulfilling East Longmeadow's statutory duty.

Dr. George Madous testified on behalf of defendants. He is an expert in school ef-fectiveness and educational testing. Dr. Madous recognized that standardized tests are used for many important educational decisions, such as determining whether to graduate a student, whether to hire or fire a teacher, and to assess the effectiveness of public schools.

Dr. Madous, however, expressed a general concern about the reliance on tests alone in making important educational decisions. This concern is based, in part, on his view that high stakes create incentives for a school or school system to cheat on the tests. Although he did not have any evidence of impropriety in the administration of standardized tests at New Life, he would be concerned about the integrity of its testing procedures if test results were to be used to determine whether its Academy should be approved. His concern would be satisfied, however, if an independent contractor was engaged to administer tests acceptable to the School Committee. This concern could also be addressed by having the tests administered to New Life students by representatives of the School Committee in the public schools.

Dr. Madous also expressed other concerns regarding the value of testing in the context of this case. Testing, in his view, is an *ex post facto* measure which would expose children to losing a period of effective learning time if the results revealed a problem with their education. Dr. Madous also noted that no standardized tests exist to measure ability in drawing, music, health education (including sex education), physical education, and citizenship, which are all subjects he considers important to the state's interest in the adequacy of a child's education. He acknowledged, however, that appropriate standardized tests in some of these areas, including citizenship, could be devised.

Dr. Madous also testified that standardized tests could adequately measure the

---

**10.** The experts testified that standardized test scores are correlated to socio-economic status. The evidence did not indicate that the students at New Life Academy have the same socio-economic background as those in East Longmeadow, which is an upper-middle class communi-ty. Thus, although M.G.L. c. 76, § 1 establishes East Longmeadow as the comparator for New Life, the experts agreed that East Longmeadow was not the benchmark they would choose to evaluate New Life.

efficiency and thoroughness of instruction in the subjects tested. The Stanford Achievement test does this in the areas of English, reading, and arithmetic. Indeed, Dr. Madous indicated that children who performed satisfactorily on the periodic Massachusetts Basic Skills Tests, which measure reading, mathematics and writing, would be adequately progressing toward becoming productive workers and effective citizens.

In addition, Dr. Madous testified that it would be feasible, although expensive, for school officials to do individual follow-up concerning New Life children whose test results suggest problems. Dr. Madous felt that most parents, including parents whose children attend New Life, want a good education for their children. He expects that if school authorities informed New Life Academy parents that their children were doing poorly in school, they would at least seriously consider sending their children to another fundamentalist Christian school, such as First Baptist's.

As their final witness, defendants presented the expert testimony of Dr. Kevin Ryan, a professor of education at Boston University who specializes in teacher training. Dr. Ryan expressed the view that New Life's teachers did not appear to have either the subject matter knowledge or educational training necessary to be qualified to teach. In his view, a college degree, even if not in education, is essential for a person to be minimally qualified to begin teaching. He felt that a college degree of any type would adequately evidence the exposure to subject matter and teaching technique necessary for one to teach.

Dr. Ryan testified that the East Longmeadow approval process is a reasonable means of determining whether New Life Academy should be approved. He did not, however, view each element of it as essential to determining whether instruction in the legally required subjects at New Life equals in efficiency, thoroughness, and progress to that in the East Longmeadow schools.

Dr. Ryan also testified that East Longmeadow's process was not, in his opinion, the only acceptable means of assuring that instruction at New Life in the legally required subjects is comparable in efficiency, thoroughness and progress to instruction in East Longmeadow. In his view, it would be minimally adequate to satisfy the state's interest in the education of New Life students if the School Committee received (1) the curriculum used by New Life showing that the legally required subjects were being taught; (2) resumes of New Life teachers indicating that all had college degrees; and (3) standardized test scores showing that the students were doing at least average work in reading, writing, and arithmetic.

Dr. Ryan also expressed the belief that if public school officials told New Life parents that standardized test scores indicated their children were performing below their potential, the parents would seek to identify the difficulty and exert their influence to improve their children's educational environment.

8. *The East Longmeadow Approval Process, As Applied to Plaintiffs, is Not the Least Restrictive Means of Satisfying the State's Legitimate Interest in Education.*

Having considered the substance and credibility of all of the testimony presented regarding the value of standarized testing generally and plaintiffs' proposal as most fully elaborated by Dr. Reynolds particularly, the court concludes as follows.

The defendants in this case have been attempting to perform their statutory duty under M.G.L. c. 76, § 1. They are genuinely concerned about the educational welfare of New Life students. They also have a reasonable basis to be concerned about the qualifications of at least some New Life teachers to instruct children.

Defendants have not, however, been sufficiently sensitive to plaintiffs' sincere religious objections to submitting their educational ministry for government approval. Nor, as discussed in the Conclusions of Law, have defendants recognized the limits of the legitimate state interest in the education of children and the parents' preemi-

nent role in selecting among educational alternatives which are adequate to satisfy the state's interest. As described in the Conclusions of Law, the state's interest is in assuring that a child's education occurs in a safe and healthy environment and prepares the child to be a productive worker and effective citizen in our democracy. To achieve this goal, Massachusetts law requires that a child attend school in a safe building until age sixteen, or about tenth grade. Plaintiffs provide a safe school for New Life students, teach the subjects the state feels are essential, and require that New Life students attend school until at least age sixteen.

However, the testimony presented and the inferences which the court has drawn from it indicate that this case involves, in part, a clash of educational philosophies. Plaintiffs want New Life students to be educated in their own religious faith. This involves, among other things, an enduring commitment to submit to the word of God as plaintiffs understand it. As expressed most vividly by Dr. Drinkwater, defendants seem animated in part by a desire to assure that New Life students develop a "thirst for knowledge." Although not plainly stated by any witness, the court infers that this "thirst for knowledge" includes the capacity to question the submissive faith these students now share with their parents. As described in the Conclusions of Law, any effort to encourage New Life students to question the faith they share with their families exceeds the state's legitimate interest in education.

In any event, the court concludes that standardized tests exist or could feasibly be devised to measure the efficiency, thoroughness, and progress of the learning of New Life students in the subjects they must master to become productive workers and effective citizens.

The School Committee can require that New Life students take standardized tests, selected by the School Committee, at periodic intervals. It is feasible to assure the integrity of the standardized testing process and, therefore, the reliability of the test results. If East Longmeadow does not trust New Life to administer the tests, an independent contractor may be engaged or the tests may be administered to New Life students by East Longmeadow officials in the public schools.

It is also feasible for the School Committee to acquire from New Life adequate information concerning the courses taught, the curriculum used, and the academic credentials of New Life teachers, among other things. The School Committee can also obtain the results of the standardized tests from the parents of students at New Life, if not from the school, or directly from any testing service utilized.

It is also feasible for the School Committee to follow up individually any case in which the test results suggest that a student is not learning adequately. This follow-up could include discussions with New Life parents and, where desirable, with New Life teachers. It could also involve further testing when appropriate. This is an approach now regularly utilized with regard to children in Massachusetts who may have learning disabilities.

The court expects that New Life parents would be responsive to any problems identified by this process concerning the education offered at New Life or their child's ability to learn. They would likely respond by causing New Life to improve the education offered, transferring their child to another fundamentalist Christian school—which is a viable alternative in East Longmeadow—or by placing their child in another school equipped to address their child's educational needs. If parents do not respond in a manner satisfactory to the East Longmeadow School Committee, it may initiate civil litigation with a view to obtaining an order removing the child from his parents' custody or requiring a specific form of education for the child.

The foregoing process may be sufficient to satisfy the state's interest in the education of New Life students. The court does, however, recognize that testing is an *ex post facto* measure of the adequacy of instruction. The defendants contend that the *ex post facto* nature of the testing process necessitates teacher qualification requirements, particularly a requirement that each teacher have a college degree.

As indicated earlier, the record at trial was not fully developed concerning the issue of whether requiring that teachers have a college degree, or other particular academic credentials indicating exposure to teaching techniques and the subject matter to be taught, is essential to assuring that students are adequately educated. It is not, however, necessary or appropriate for the court to decide now whether particular teacher credentials, in addition to the previously described program of standardized testing and individual follow-up, are necessary to satisfy the state's interest in the education of New Life. This issue should be addressed by East Longmeadow. It is possible that East Longmeadow will receive guidance from the state government, the Massachusetts legislature, or the Supreme Judicial Court concerning this question. In any event, plaintiffs will have to respond to the School Committee's revised effort to assure that New Life students are adequately educated. This process may obviate the need for further litigation concerning a teacher credential requirement, among other things. If not, the relevant questions will be clarified and the evidentiary record may be amplified.

It is sufficient for present purposes that the court now finds that East Longmeadow has not shown that its approval process is the least restrictive means of assuring New Life students are adequately educated. Rather, the evidence demonstrates that standardized testing and individual follow-up, or such testing, follow-up and a requirement that teachers have appropriate academic credentials, would be adequate to satisfy the state's interest in the education of New Life students. Either approach imposes a lesser burden on the free exercise of plaintiffs' religious beliefs than the East Longmeadow approval process. Neither would violate the Establishment Clause of the First Amendment of the United States Constitution.

### 9. *The East Longmeadow Approval Process Would Result in the Excessive Entanglement of the State and Religion.*

In contrast, as described in the Conclusions of Law, the East Longmeadow approval process at issue in this case would foster a constitutionally unacceptable degree of entanglement between the government and religion. Because many New Life teachers do not have college degrees, the initial approval process would require East Longmeadow representatives to make frequent visits to many classrooms to observe teaching. As all subjects are taught at New Life from a religious perspective, these visits would necessarily involve surveillance of religious as well as secular instruction.

This surveillance would not be an end in itself. In this case it is foreseeable that it would lead to suggestions for improvement of instruction, coupled with offers of public advice and assistance. It is likely that East Longmeadow would strongly suggest, if not formally require, that New Life replace many present teachers with college graduates. New Life's response to East Longmeadow's suggestions or requirements would substantially affect whether approval of the school would be granted. If the Academy were approved, its right to retain that status would be reviewed every two years. Cumulatively, this interaction would constitute an excessive entanglement of government and religion.

### 10. *Summary*

In summary, the court concludes that the East Longmeadow approval process at issue in this case would burden the free exercise of plaintiffs' religious beliefs in an effort to satisfy the state's compelling interest in assuring that New Life students are adequately educated. It is not, however, the least restrictive means of satisfying that compelling state interest. In addition, the East Longmeadow approval process would foster an excessive entanglement of the government and religion. The alternative means which East Longmeadow could use to assure that New Life students were being adequately educated would not foster an excessive entanglement of government with religion. Thus, for the reasons explained in the Conclusions of

Law, the East Longmeadow approval process, as applied to plaintiffs, violates the First Amendment.

## III. CONCLUSIONS OF LAW

### A. *The Meaning of M.G.L. c. 76, § 1*

There is a threshold issue regarding the meaning of M.G.L. c. 76, § 1 which must be resolved prior to addressing whether that provision is unconstitutional as defendants have sought to apply it to plaintiffs. Plaintiffs contend that the statute does not authorize the East Longmeadow School Committee to consider the qualifications of New Life's teachers. Defendants disagree. The court concludes that M.G.L. c. 76, § 1 permits a school committee to examine the qualifications of private school teachers to instruct children, but does not require such an examination.

Plaintiffs' argument that M.G.L. c. 76, § 1 does not authorize examination of private school teacher competency relies on the language of that provision, particularly as it compares to M.G.L. c. 71, § 1, which pertains to public school teachers. M.G.L. c. 71, § 1 provides that public school teachers shall be "of competent ability and good morals." M.G.L. c. 76, § 1 does not contain a comparable requirement. Rather, M.G.L. c. 76, § 1 provides that a private school shall be approved when the school committee is "satisfied that the *instruction* in all the studies required by law equals in thoroughness and efficiency, and in the progress made therein, that in the public schools in the same town." (emphasis added).

Plaintiffs, therefore, contend that a comparison of the relevant public and private school provisions show that the drafters knew how to provide plainly for authorizing inquiry into teacher competence and did not do so in the law relating to private schools. Plaintiffs argue that M.G.L. c. 76, § 1 authorizes inquiry solely concerning "instruction"—that is, what is being taught—rather than examination of the "instructors." Plaintiffs believe this interpretation is not only compelled by the language of M.G.L. c. 76, § 1, but is consistent with the Massachusetts Supreme Judicial Court's construction of the predecessor statute to M.G.L. c. 76, § 1. With regard to that statute, the Supreme Judicial Court said, "the great object of these provisions of the statutes has been that all children shall be educated, not that they shall be educated in any particular way." *Commonwealth v. Roberts*, 159 Mass. 372, 374, 34 N.E. 402 (1893).

While plaintiffs' construction of M.G.L. c. 76, § 1 is arguably reasonable, it is not right. The Massachusetts Supreme Judicial Court recently addressed M.G.L. c. 76, § 1 as applied to home education[11] and, in pertinent part, construed it as follows:

> The superintendent or school committee *may* also examine the competency of the parents to teach the children. General Laws c. 71, § 1, provides that teachers shall be "of competent ability and good morals." While we recognize that teachers in public schools must be certified, certification would not appropriately be required for parents under a home school proposal. [citations omitted]. Nor must the parents have college or advanced academic degrees. However, the superintendent or school committee *may* properly inquire as to the academic credentials or other qualifications of the parent or parents who will be instructing the children.

*Care and Protection of Charles & Others*, 399 Mass. at 339, 504 N.E.2d 592 (emphasis added). This decision indicates that the highest court of Massachusetts has interpreted M.G.L. c. 76, § 1 to permit, but not to require, a school committee to consider teachers' qualifications as an indirect means of evaluating "instruction." This construction of the state statute requires

---

**11.** The Massachusetts Supreme Judicial Court has indicated that the standard for approval of home education is determined by the standard applicable to private schools: "Our reading of this statute [c. 76 § 1] indicates that the Legislature intended that the approval of a home school proposal fall within the above enunciated standard ["thoroughness and efficiency, and in the progress made therein"] for the approval of a private school." *Care and Protection of Charles & Others*, 399 Mass. at 331, 504 N.E.2d 592.

deference from this court.[12] *Erie Railroads Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).

### B. *M.G.L. c. 76, § 1 is Being Tested Only As Applied By East Longmeadow to Plaintiffs.*

It is important to recognize that the court is not now addressing whether M.G.L. c. 76, § 1 is generally invalid for any reason. Rather, the sole issue being decided is whether M.G.L. c. 76, § 1 as construed and applied by East Longmeadow abridges plaintiffs' freedom under the First Amendment.

At the outset of this case plaintiffs contended that M.G.L. c. 76, § 1 should be generally invalidated as unconstitutionally vague and overbroad. This contention was rejected by District Judge Rya Zobel, to whom this case was initially assigned. She concluded:

> The statute on its face does not reach a substantial amount of constitutionally protected conduct, indeed, it expressly prohibits denial of approval on account of religious teaching. Nor is the language impermissibly vague. *See Bangor Baptist [Church v. State of Maine, etc.,* 549 F.Supp. 1208] at 1227 ("equivalent instruction" not overly vague). Plaintiffs thus have not met the test set forth for overbreadth and vagueness challenges in *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

*Braintree Baptist Temple v. Holbrook Public Schools,* 616 F.Supp. 81, 91 (D.Mass.1984). Therefore, the question of the constitutionality of the statute generally is not now before the court and the ruling in this case in plaintiffs' favor should not suggest that the provisions of M.G.L. c. 76, § 1 will usually be found to be an unacceptable way for the state to

discharge its responsibility to assure that children are adequately educated.

However, M.G.L. c. 76, § 1, like "almost every law[,] is potentially applicable to constitutionally protected acts; that danger [does not] invalidate the law as such, but merely [invalidates] its enforcement against protected activity." L. Tribe, *American Constitutional Law* 711 (1978). *See United States v. Spock,* 416 F.2d 165, 173 n. 20 (1st Cir.1969) ("The fact that a seemingly normal criminal statute, by virtue of its prohibition of conspiracy and crime counseling, may in some instances apply to affect freedom of association or freedom of speech does not invalidate the statute. [citations omitted]. The court's obligation is, rather, to make sure that such a statute does not improperly infringe upon speech in any particular instance.").

For the reasons explained below, the court has concluded that the specific manner in which East Longmeadow has sought to apply M.G.L. c. 76, § 1 to the plaintiffs in this case violates plaintiffs' First Amendment rights. However, as the Supreme Court said in *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), "Nothing [in this decision] is intended to undermine the general applicability of the State's compulsory school attendance statutes or to limit the power of the State to promulgate reasonable standards that, while not [violating the First Amendment] provide for ..." assuring that the children involved in this case, and others similarly situated, are adequately educated. *Id.* at 236, 92 S.Ct. at 1543.

### C. *The Purposes of the First Amendment*

This case raises fundamental issues concerning the "wall of separation between church and state" erected by the First Amendment. Thus, it is appropriate to rec-

**12.** The court notes that the decision in *Care and Protection of Charles & Others,* involved analysis of parents' rights under the Fourteenth Amendment to control the education of their children, rather than analysis of their First Amendment rights. 399 Mass. at 333, 504 N.E.2d 592. That case is also factually distinguishable in material respects from the present case. In any event,

while this court defers to the Massachusetts Supreme Judicial Court in its interpretation of the meaning of M.G.L. c. 76, § 1, the decisions of the state court do not diminish this court's responsibility to analyze independently the federal First Amendment questions presented by the facts of this case.

ognize clearly the interests intended to be protected by the First Amendment.

The First Amendment of the United States Constitution provides in part that, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The Fourteenth Amendment extended this prohibition to state and local governments. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (free exercise); *Everson v. Board of Education*, 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–12, 91 L.Ed. 711 (1947) (establishment clause).

In 1802, Thomas Jefferson wrote the Baptists of Danbury, Connecticut referring to the First Amendment by stating that:

> [I] contemplate with sovereign reverence that act of the whole American people which declared that their legislature should "make no law respecting an establishment of religion or prohibiting the free exercise thereof," thus building a wall of separation between church and state.

Thomas Jefferson, *Writings* 510 (The Library of America ed. 1983).

Jefferson's metaphor of a wall of separation was not, however, original. Rather, it derived from the Baptist Roger Williams writing that:

> The faithful labors of many witnesses of Jesus Christ, extant to the world, abundantly proving that the church of the Jews under the Old Testament in the type, and the church of the Christians under the New Testament in the antitype, were both separate from the world; and that when they have opened a gap in the hedge or wall of separation between the garden of the church and the wilderness of the world, God hath ever broke down the wall itself, removed the candlestick, and made His garden a wilderness, as at this day. And that therefore if He will ever please to restore His garden and paradise again, it must of necessity be walled in peculiarly unto Himself from the world; and that all that shall be saved out of the world are to be transplanted out of the wilderness of the world, and added unto his church or garden.

Mark DeWolfe Howe, *The Garden and the Wilderness* 6 (1965).

Jefferson's desire for a separation of church and state was motivated primarily by a concern that in its absence religious authorities would exert improper influence on government to establish a religion, to impose their beliefs on others and otherwise unduly affect public policy. In contrast, Williams' wish for such separation was primarily motivated by a concern that the spiritual freedom of individuals and churches would be jeopardized if it was not safeguarded from the authority of government.

The framers of the First Amendment intended to serve Williams' purposes as well as Jefferson's. Thus:

> The purposes of the First Amendment ... were twofold: to foreclose state interference with the practice of religious faiths, and to foreclose the establishment of a state religion.... Religion and government, each insulated from the other, could then coexist.

*Larkin v. Grendel's Den*, 459 U.S. 116, 122, 103 S.Ct. 505, 510, 74 L.Ed.2d 297 (1982).

The interests which plaintiffs assert in this case are plainly among those which the First Amendment's wall of separation was originally intended to protect. *See Lemon v. Kurtzman*, 403 U.S. 602, 623, 91 S.Ct. 2105, 2116, 29 L.Ed.2d 745 (1971). As Justice Stanley Reed once wisely warned, however, "a rule of law should not be drawn from a figure of speech." *McCollum v. Board of Education*, 333 U.S. 203, 247, 68 S.Ct. 461, 482, 92 L.Ed. 649 (1948). Considerable, complex law has evolved regarding both the Free Exercise and Establishment Clauses of the First Amendment. It is, therefore, necessary to analyze, individually and in detail, the effect of each of those provisions as applied to the facts of this case.

### D. *The Free Exercise Clause*
#### 1. *The Applicable Standards*

◼ The Supreme Court has recently reaffirmed that Free Exercise claims are to

be subject to "strict scrutiny." *Hobbie v. Unemployment Appeals Commission of Florida*, —— U.S. ——, 107 S.Ct. 1046, 1049, 94 L.Ed.2d 190 (1987). Thus, to determine whether the Free Exercise Clause is violated the court must decide:

    1. Whether plaintiffs' challenge is motivated by a sincerely held religious belief;

    2. Whether plaintiffs' free exercise of religion is burdened by the challenged government action;

    3. Whether the challenged government conduct serves a compelling state interest; and, if so

    4. Whether the government has proven that the challenged conduct is essential to achieving, or is the least restrictive means of achieving, that compelling state interest.

*Thomas v. Review Board*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 ("The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest."); *United States v. Lee*, 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) ("The state may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest."); *Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533 ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion.").

As Justice Sandra Day O'Connor has recently observed, although the Supreme Court has not been uniform in the language it has employed in articulating the test to be applied to the free exercise claims:

One can ... glean at least two consistent themes from the [Supreme Court's] precedents. First, when the government attempts to deny a Free Exercise claim, it must show that an unusually important interest is at stake, whether that interest is denominated "compelling," "of the highest order," or "overriding." Second, the government must show that granting the requested exemption will do substantial harm to that interest, wheth-

er by showing that the means adopted is the "least restrictive" or "essential," or that the interest will not "otherwise be served." These two requirements are entirely sensible in the context of an assertion of a free exercise claim. First, because the government is trying to override an interest specifically protected by the Bill of Rights, the government must show that the interest it asserts is of especial importance before there is any chance that its claim can prevail. Second, since the Bill or Rights is expressly designed to protect the individual against the aggregated and sometimes intolerant power of the state, the government must show that the interest asserted will in fact be substantially harmed by granting the type of exemption requested by the individual.

*Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 1325, 89 L.Ed.2d 478 (1986) (O'Connor, J., dissenting).

The strict scrutiny doctrine imposes a heavy burden on the government when it is required to demonstrate that it is seeking to use the least restrictive means necessary to serve a compelling state interest. *United States v. Lee*, 455 U.S. at 262, 102 S.Ct. at 1057–58 (Stevens, J., concurring in judgment.) (Supreme Court's formulation of the constitutional standard "suggests that the Government always bears a heavy burden of justifying the application of neutral laws to individual conscientious objectors."); *Callahan v. Woods*, 736 F.2d 1269, 1272 (9th Cir.1984) ("The government must shoulder a heavy burden to defend a regulation affecting religious actions.").

In addition, it should be recognized that strict scrutiny is not properly characterized as a balancing test. In the context of this case, strict scrutiny means that when the government's effort to serve a compelling state interest burdens the free exercise of religion, the state must prove it is employing the least restrictive means of achieving its goal. *Thomas*, 450 U.S. at 718, 101 S.Ct. at 1432; *Lee*, 455 U.S. 252, 102 S.Ct. 1051. In addressing the discrete question of whether a state is using the least restrictive means to serve its purposes, the court

is not called upon to balance its perception of the weight of the burden on an individual's religious belief against its assessment of the importance of the competing state interest or the possible cost of non-compliance with the state's program.[13] Balancing necessarily entails particularly subjective judgments. Strict scrutiny makes the decisive question the more objective issue of whether the state is employing the least restrictive means of satisfying its interest.

Strict scrutiny analysis serves an important purpose of the First Amendment which could be subtly but significantly threatened if a true balancing test was to be applied to resolve free exercise claims. As Justice William Brennan has written:

> A critical function of the Religion Clause of the First Amendment is to protect the rights of members of minority religions against quiet erosion by majoritarian social institutions that dismiss minority beliefs and practices as unimportant because unfamiliar. It is the constitutional role of [the courts] to ensure that this purpose is realized.

*Goldman v. Weinberger*, 106 S.Ct. at 1321–22 (Brennan, J., dissenting).

The judicial process, however, is also in meaningful measure a majoritarian social institution. Decisions in free exercise cases may be rendered by juries composed of representatives of the community. When, as in this case, a jury is waived and a free exercise claim is tried only to a judge, the risks to which Justice Brennan referred do not disappear. Judges tend to be chosen from the mainstream of the community. They too may be prone to confuse the familiar with the important. In the process, if directed to balance interests which must be subjectively weighed, judges may improperly deny the protections of the First Amendment to the perhaps peculiar minorities which need them

most. Strict scrutiny analysis reduces this risk.

Thus, it is important to reiterate that the court is not authorized to balance its perception of the burden on the exercise of plaintiffs' religious beliefs against its assessment of the importance of the state's competing interest to determine who should prevail in this case. Rather, as will be explained, plaintiffs have shown that East Longmeadow's approval process burdens the free exercise of their sincere religious beliefs. East Longmeadow has shown that its approval process seeks to serve a compelling state interest. The critical question, therefore, is whether East Longmeadow has shown that its approval process is the least restrictive means of assuring that the children who attend New Life Academy are adequately educated. The defendants have failed to make this showing. To the contrary, the evidence indicates that there are adequate legal means of achieving the state's interest in a manner which will not impermissibly burden the free exercise of plaintiffs' religious beliefs. Thus, East Longmeadow's approval process, as applied to plaintiffs, violates the Free Exercise Clause.

### 2. *Plaintiffs' Challenge is Motivated By Their Sincerely Held Religious Beliefs.*

As explained fully in the Findings of Fact, the court has concluded that plaintiffs' challenge to the East Longmeadow approval process is primarily motivated by their sincerely held religious beliefs. Plaintiffs' religion does not permit them to recognize the authority of the state to control aspects of New Life's educational ministry. Thus, plaintiffs truly believe it would be a sin to seek or accept approval of the state for New Life's educational ministry. For the same reasons, although they have no religious objection to hiring college-trained teachers who meet their other criteria,

---

**13.** The court recognizes that some language in *Yoder* suggests that a balancing approach may be applicable to First Amendment claims. 406 U.S. at 214, 92 S.Ct. at 1532. ("[A] State's interest in universal education is not totally free from a balancing process when it impinges on fundamental rights and interests ... specifically protected by the Free Exercise Clause of the First Amendment."). The evolution of the law since *Yoder*, however, particularly the formulation of the relevant questions in *Thomas* and *Lee* and the statement in *Hobbie* that strict scrutiny is required in free exercise cases, persuades this court that a balancing of competing interests is not now permitted in deciding free exercise issues such as those presented by this case.

plaintiffs have a religious objection to being directed to do so by the government. These sincere religious concerns have caused plaintiffs to challenge East Longmeadow's approval process.

### 3. *East Longmeadow's Approval Process Burdens the Free Exercise of Plaintiff's Religious Beliefs.*

As the Supreme Court stated in *Thomas:*

Where the state conditions receipt of an important benefit on conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

450 U.S. at 717–18, 101 S.Ct. at 1432, *quoted in Hobbie,* 107 S.Ct. at 1049; *see also Hernandez v. Commissioner of Internal Revenue,* 819 F.2d 1212, 1221 (1st Cir. 1987). The Supreme Court has also recognized that the burden upon the free exercise of religious belief is particularly great where the individual is confronted with a choice between respecting his religious convictions and risking criminal prosecution. *Yoder,* 406 U.S. at 218, 92 S.Ct. at 1534 ("The impact of the compulsory-attendance law on respondent's practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs.").

In this case, the plaintiffs believe that it would be a sin to seek or accept approval from the state for New Life's educational ministry. East Longmeadow, however, has pursuant to M.G.L. c. 76, § 1 required that New Life Academy request and obtain approval. New Life parents now face the prospect of criminal prosecution if they continue to send their children to the Academy. This puts pressure on plaintiffs to seek approval, in violation of their beliefs, and thus run the risk of divine retribution. Therefore, M.G.L. c. 76, § 1, as applied by

East Longmeadow, burdens plaintiffs' free exercise of religion.

Defendants contest this conclusion, however. They claim that while plaintiffs have a religious belief against approval by civil government, they have failed to show how the East Longmeadow approval process burdens the free exercise of their religion because they do not have a religious objection to any of the specific criteria which East Longmeadow seeks to employ in deciding whether to approve the school. *See* Attorney General's and East Longmeadow's Post-Trial Memorandum, 6–10.

Defendants' contention regarding the burden on the exercise of plaintiffs' beliefs is incorrect. It has long been recognized that there is a significant burden imposed by official actions which compel an individual to acknowledge the authority of the state when it is contrary to his convictions to do so. In 1942, the Supreme Court declared unconstitutional compulsory flag salute laws because it found that absent a clear and present danger, nobody—whether religiously motivated or not—should be coerced against his will to affirm a belief in the form or authority of our government. *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 633, 63 S.Ct. 1178, 1183, 87 L.Ed. 1628 (1943).

The particular burden which compelled acknowledgment of the authority the state can impose on the exercise of religious belief was familiar to the framers of the First Amendment. As was well-known when the First Amendment was adopted, "[e]arly Christians were frequently persecuted for their refusal to participate in ceremonies before the statue of the emperor or other symbol of imperial authority." *Barnette,* 319 U.S. at 633 n. 13, 63 S.Ct. at 1183 n. 13. Similarly, the Jewish festival of Purim then celebrated the triumph over persecution triggered by one Jew's unwillingness to bow to a Persian king's counselor because the Jewish people worshipped only God.

In addition, the framers were well aware of more contemporary illustrations of the issue. When the First Amendment was enacted, Sir Thomas More (later to become

St. Thomas More) had already achieved recognition as a martyr for his refusal on religious grounds in 1535 to recognize the supremacy of the King of England over the Pope. Donald Thomas, Editor, "Sir Thomas More," in *State Trials*, Volume 1 at 34 (Routledge & Kegnan Paul 1972). As the framers also knew, in America, "the Quakers, William Penn included, [had] suffered punishment rather than uncover their heads in deference to any civil authority." *Barnette*, 319 U.S. at 633 n. 13, 63 S.Ct. at 1183 n. 13. These facts reinforce the conclusion that the East Longmeadow approval process imposes a burden on the free exercise of plaintiffs' religion within the meaning of the First Amendment.

Defendants also suggest that the court disregard the fact that East Longmeadow for several years insisted that New Life seek approval. As explained in the Findings of Fact, at trial Dr. Drinkwater indicated that if a private school like New Life fully participated in the approval process, but had a religious objection to saying that it was seeking or accepting approval, he would no longer recommend that it be required to state that it was seeking or accepting approval. Based upon this testimony, defendants suggest that the court should regard the requirement that plaintiffs seek approval as moot, or no longer relevant. *See* Attorney General's and East Longmeadow's Post-Trial Memorandum at 4.

Defendants' suggestion is tempting because courts should not decide constitutional issues if it is not necessary to do so. *Coffman v. Breeze Corps, Inc.*, 323 U.S. 316, 324–25, 65 S.Ct. 298, 303, 89 L.Ed. 264 (1945). In this case, however, it would be inappropriate to adopt defendants' suggestion for several compelling reasons.

As a general rule:

A defendant cannot ordinarily moot a plaintiff's claim by voluntarily ceasing allegedly unlawful conduct. Such acquiescence would necessarily be without effect if plaintiff is seeking damages for past wrongs. But even an action for injunction, or for other relief with continuing force, is not rendered moot by the voluntary cessation of allegedly illegal conduct, since a "defendant is free to return to his old ways," and since there is "a public interest in having the legality of the practices settled...." However, in the event of voluntary cessation, a "case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."

Tribe, *American Constitutional Law* § 3–14 at 67 (footnotes omitted.)

In the instant case, East Longmeadow insisted for several years that New Life request approval. Plaintiffs are seeking money damages for past wrongs, as well as prospective relief. Thus, the legality of East Longmeadow's conduct must be resolved.

In addition, it is not certain that Dr. Drinkwater's suggestion at trial represents an alteration of the official East Longmeadow policy regarding approval. Nor is it clear that, absent a decision in this case, East Longmeadow would not reinstitute its approval requirements in the future.

Because the issue presented by this case might recur in communities throughout the Commonwealth of Massachusetts, there is a particular "public interest in having the legality of the practices settled." *Id.; see also United States v. W.T. Grant*, 345 U.S. 629, 632–633, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953); *Sanchez-Mariani v. Ellingwood*, 691 F.2d 592, 595 (1st Cir.1982). Indeed, the City of Boston is deferring enforcement of the truancy laws against certain Braintree Temple Academy parents pending the guidance to be provided by the final adjudication of this case. *See supra* note 4.

There is another aspect of the public interest which influences the court not to ignore East Longmeadow's prior insistence that New Life seek approval. The Supreme Court has made it clear that when confronted with sincere religious objections, public officials must adopt the least restrictive means of achieving the compelling state interest they seek to serve. It is vital that such officials understand that

they have this obligation and that they take it seriously from the outset, rather than belatedly recognizing it in the midst of trial. It is expensive and arduous to initiate a case and to bring it to trial. Plaintiffs in this case have done so, but many similarly situated might not. Rather, potential plaintiffs unable or unwilling to sue might suffer serious injury to their freedom of religion because local officials have not recognized and responded to their constitutional duty to minimize the burden which their actions impose on that freedom. This case should serve as a reminder of the continuing relevance of Justice Robert Jackson's observation that:

> The [Constitution] protects the citizens against the State itself and all of its creatures—Boards of Education not excepted. These have, of course, important, delicate, and highly discretionary functions, but none that they may not perform within the limits of the Bill of Rights. That they are educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to ... teach youth to discount important principles as mere platitudes.
> Such boards are numerous and their territorial jurisdiction is often small. But small and local authority may feel less sense of responsibility to the Constitution, and agencies of publicity may be less vigilant in calling it to account.... There are village tyrants as well as village Hampdens, but none who acts under color of law is beyond the reach of the Constitution.

*Barnette*, 319 U.S. at 637–38, 63 S.Ct. at 1185.

In addition, Dr. Drinkwater's suggestion that New Life might be allowed to provide all of the information requested so the School Committee could decide whether to approve the Academy, without requiring New Life to say it is seeking approval, would not necessarily eliminate the free exercise clause claim in this case, or eliminate the Establishment Clause issues presented. The record was not fully developed on the effect this modification by East Longmeadow would have on plaintiffs because the question emerged at trial after plaintiffs had testified. The court hopes that the parties will fully explore whether Dr. Drinkwater's proposal would eliminate any or all of the burden which the approval process places on plaintiffs' free exercise of religion. This, however, remains uncertain.[14]

In addition, assuming that Dr. Drinkwater's proposal eliminates the burden on the exercise of plaintiffs' religious beliefs created by the requirement that they request and accept approval, it would probably not eliminate completely the burden imposed by the state on plaintiffs. It is foreseeable that East Longmeadow would refuse to approve New Life Academy because so many of its teachers are not college-educated. Rather, East Longmeadow would attempt to require that New Life hire additional college-trained teachers. Although plaintiffs have no religious objection to employing college-trained teachers, they do have a religious objection to being told by the state whom they can employ. Thus, such a requirement would burden plaintiffs' free exercise rights, although not necessarily impermissibly.

For the foregoing reasons, the plaintiffs have shown that the East Longmeadow approval process burdens the free exercise of their sincere religious beliefs.

This conclusion is not qualified because New Life sought government approval for

---

**14.** Defendants contend that in *Bowen v. Roy*, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986), the Supreme Court has found that private parties may not invoke the Free Exercise Clause to prohibit the state from using information concerning them. This is true. *Bowen*, 476 U.S. at ——, 106 S.Ct. at 2152, 90 L.Ed.2d at 745 ("The Free Exercise Clause affords an individual protection from certain forms of governmental compulsion; it does not afford an individual a right to dictate the conduct of the Government's internal procedures."). Nevertheless, if as events evolve plaintiffs contend and establish that furnishing required information for use by East Longmeadow in deciding whether to approve New Life burdens the free exercise of their religion, the government's need for that information will be subject to strict scrutiny. *Hobbie*, 107 S.Ct. at 1049.

its building in connection with complying with building and fire codes, changed its academic year to 180 days to comply with state law, and sought incorporation of the church under state law. These arguable inconsistencies regarding approval reflect distinctions plaintiffs sincerely make in the application of their religious beliefs. That is sufficient. *See Thomas,* 450 U.S. at 706, 101 S.Ct. at 1425 ("Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others to merit First Amendment protection.").

Similarly, the burden on plaintiffs is not diminished by the fact that some born again Christians do not object to seeking approval for their schools when, as here, plaintiffs do object based upon their religion as they understand it. As the Supreme Court has said:

> Intrafaith differences of [this] kind are not uncommon among followers of a particular creed, and the judicial process is singularly ill-equipped to resolve such differences in relation to the Religion clauses.... [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect ... [I]t is not within the judicial function and judicial competence to inquire whether [plaintiffs] or [others] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Id.* at 715–16, 101 S.Ct. at 1430–31. Indeed, such differences are particularly likely where, as here, the religious denomination has a congregationalist structure which permits different churches to decide some matters of faith for themselves.

Finally, the fact that plaintiffs as born again Christians may not be part of a movement as long established as, for example, the Amish is not material. Rather, it is the sincerity of their religious beliefs which is relevant. *See Hobbie,* 107 S.Ct. at 1051 ("The timing of Hobbie's conversion is immaterial to our determination that her free exercise rights have been burdened ...").

4. *Education Is a Compelling Interest.*

As indicated earlier, "The mere fact that [plaintiffs'] religious practice is burdened by state action does not mean that an exemption must be granted. The state may justify an inroad on religious liberty by showing that it is the least restrictive means of achieving some compelling state interest." *Thomas,* 450 U.S. at 718, 101 S.Ct. at 1432.

Education constitutes a compelling state interest. As the Supreme Court stated in *Brown v. Board of Education:*

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society.

347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). *See also Yoder,* 406 U.S. at 213, 63 S.Ct. at 1532 ("Providing public schools ranks at the apex of the function of a State"); *Meyer v. Nebraska,* 262 U.S. 390, 400, 43 S.Ct. 625, 627, 67 L.Ed. 1042 (1923) (The "American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance.").

It is necessary, however, to define with some care the degree of education required to serve the state's compelling interest. This is necessary to determine whether that interest will be substantially harmed if East Longmeadow is enjoined from utilizing the approval process at issue in this case. A careful focus is especially important in this case, for it, like *Yoder,* "calls into question traditional concepts of parental control over the religious upbringing and education of their minor children...." 406 U.S. at 231, 63 S.Ct. at 1541.

With regard to the state's compelling interest in education, the Supreme Court said in *Yoder:*

> [A]s Thomas Jefferson pointed out early in our history, ... some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. Further, education prepares individuals to be self-reliant and self-sufficient participants in society.

*Id.* at 221, 63 S.Ct. at 1536. More recently, the Supreme Court has reiterated that the twin goals of education are to inculcate the skills and values necessary to maintain our democratic system and to provide "the basic skills by which individuals might lead economically productive lives to the benefit of us all." *Plyler v. Doe,* 457 U.S. 202, 221, 102 S.Ct. 2382, 2397, 72 L.Ed.2d 786 (1982).

In *Yoder* and *Plyler* the Supreme Court indicated that it is "basic education" imparting "basic skills" in which the state is legitimately interested. As the Supreme Court elaborated in *Yoder,* "When Thomas Jefferson emphasized the need for education as a bulwark of a free people against tyranny, there is nothing to indicate that he had in mind compulsory education through any fixed age beyond a basic education." *Yoder,* 406 U.S. at 225, 63 S.Ct. at 1538. Rather, "[s]o far as the mass of people were concerned, [Jefferson] envisaged that a basic education in the 'three Rs' would sufficiently meet the interests of the State." *Id.* at 226 n. 14, 63 S.Ct. at 1538 n. 14.

Although our society has become much more complex since Jefferson's time, and education in the three Rs alone may be insufficient, the state's legitimate interest remains in "basic education." Indeed, Massachusetts seems to recognize this by only requiring that children attend school until age sixteen—that is only to the tenth grade at most.[15]

As described in the Findings of Fact, this case involves, in part, a clash of educational philosophies between plaintiffs and defendants, all of whom are concerned about the future of the children at issue. Plaintiffs want the children educated in their own religious faith. This entails, among other things, an enduring commitment to submit to the word of God as they understand it. Defendants seem motivated in part by a desire to assure that New Life students develop what Dr. Drinkwater called a "thirst for knowledge." Counsel characterized this as an "ability to engage in independent thinking." Attorney General's and East Longmeadow's Post-Trial Memorandum at 14. The court infers that one element of this "thirst for knowledge" or "ability to engage in independent thinking" is the capacity to question the faith which New Life children share with their parents. Thus, although not as plainly expressed as in *Yoder,* this case also presents the question of whether it is legitimate for the state to require that children be educated to assure that they can, and likely will, make an intelligent choice between submitting to their parents' religious beliefs or selecting a more conventional, secular style of life. *See Yoder,* 406 U.S. at 232, 63 S.Ct. at 1541–42.

Defendants' concern is understandable. It has been shared by at least several Justices of the Supreme Court. *See Yoder,* 406 U.S. at 240, 63 S.Ct. at 1545 (White, J., concurring) ("A State has a legitimate interest ... in seeking to prepare [children] for the life style that they may later choose, or at least provide them with an option other than the life they have led in the past."); *Id.* at 245–46, 63 S.Ct. at 1548 (Douglas, J., dissenting in part) ("If [a child] is harnessed to the Amish way of life by those in authority over him and if his education is truncated, his entire life may be stunted and deformed.").

However, when, as here, there is no conflict between the desires of parents and those of their children, the Supreme Court has held that the state is not empowered as *parens patriae* to save a child from himself or his parents by requiring more than

---

**15.** Defendants contend that the Massachusetts Constitution and the state's "high-tech economy" demonstrate that Massachusetts has an interest in seeing that its children receive more than a "basic education." This contention, if correct, would cause an individual's First Amendment rights to vary from state to state. As a particular state's interest in education increased, the federal constitutional free exercise right would diminish. The court does not concur in this contention. Rather, given the fundamental nature of an individual's First Amendment rights, the court concludes they are as a matter of law the same in Massachusetts as in any other state. In any event, the court does not find the Massachusetts Constitution to establish an interest in education different or greater than that recognized by the Supreme Court. Nor have defendants proven that there are relevant, distinctive features of the Massachusetts economy.

a basic secular education. *Yoder*, 406 U.S. at 232, 63 S.Ct. at 1541. This decision rests on the recognition that a contrary conclusion would mean that "the State [would] in large measure influence, if not determine, the religious future of the child." *Id.* Such a result would be inconsistent with "the fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education of their children." *Id.*

"The [Supreme] Court has frequently emphasized the importance of the family." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). A vital element of this is the "primary role of the parents in the upbringing of their children [which] is now established beyond debate as an enduring American tradition." *Yoder*, 406 U.S. at 232, 63 S.Ct. at 1541–42. This role derives from the fundamental principle that " 'The child is not the creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty to recognize and prepare him for additional obligations.' " *Id.* at 233, 63 S.Ct. at 1542 (quoting *Pierce v. Society of Sisters*, 268 U.S. 510, 534–535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925)). *See also Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) ("It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.").

Therefore, when, as here, a free exercise claim is combined with the interest of parenthood, the government must make a distinct showing that the state action in question is necessary. *Yoder*, 406 U.S. at 233, 63 S.Ct. at 1542. More specifically, when the power of the parent is linked to a free exercise claim, it may be subject to limitation only "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." *Id.* at 234, 63 S.Ct. at 1542.

This case does not present an issue of whether the health or safety of children who attend New Life is in jeopardy. It is not. The plaintiffs care deeply for the children's health and safety and the New Life building meets Massachusetts health and safety code requirements.

Thus, the remaining and decisive issue is whether East Longmeadow's approval process is the least restrictive means of assuring that the students who attend New Life are being adequately educated "to be self-supporting [and] to discharge the duties and responsibilities of citizenship...." *Id.* As explained below, it is not.

5. *The East Longmeadow Approval Process Is Not The Least Restrictive Means of Assuring That New Life Students Are Adequately Educated.*

In the circumstances of this case defendants must show that the East Longmeadow approval process is the least restrictive means of assuring that New Life students are adequately educated. *Thomas*, 450 U.S. at 718, 101 S.Ct. at 1432. This is a question which, once again, does not require or permit the court to balance its perception of the burden placed by the East Longmeadow approval process on plaintiffs' free exercise of religion against its perception of the importance of education.

The Court of Appeals for the Ninth Circuit has explained this, stating:

The purpose of almost any law can be traced to a fundamental concern of government. Balancing an individual's religious interest against such a concern will inevitably make the former look unimportant. It is therefore the "least restrictive means" inquiry which is the critical aspect of the free exercise analysis. This prong forces us to measure the importance of a regulation by ascertaining the marginal benefit of applying it to all individuals, rather than to all individuals except those holding a conflicting religious conviction.... If the compelling State goal can be accomplished despite the exemption of a particular individual, then a regulation which denies an exemption is not the least restrictive means of furthering the state interest.

*Callahan v. Woods*, 736 F.2d at 1272. At this point in the analysis there is a heavy burden on the defendants. *Id.*

In this case, the defendants have not satisfied their burden of showing that the East Longmeadow approval process is the least restrictive means of assuring that East Longmeadow students will be adequately educated. To the contrary, the evidence shows that there is a less burdensome means of achieving that compelling state interest. Thus, the East Longmeadow approval process is not essential. Therefore, it is not in this case permissible. *Lee*, 455 U.S. at 257–58, 102 S.Ct. at 1055.

The facts on which this conclusion rests are described fully in the Findings of Fact. To reiterate briefly, the court is persuaded that (1) providing basic information concerning the students, school and curriculum and (2) either standardized testing combined with individual follow-up when indicated, or (3) such testing and follow-up combined with a requirement that each teacher have appropriate academic credentials is less restrictive than the East Longmeadow approval process and sufficient to assure that New Life students are adequately educated.

Standardized tests either exist or can be devised to measure whether New Life students are receiving the education necessary to satisfy the state's legitimate interests. There are also feasible means of assuring the integrity of the testing process and the test results.

Substantial reliance on standardized testing in the context of this case would be consistent with the practice of educators in Massachusetts and elsewhere of giving significant weight to such tests in making a variety of "high stakes" educational decisions. A number of states, including Alaska, Arkansas, Florida, Louisiana, and North Carolina, now rely on the results of standardized tests in assessing the adequacy of education of students attending private religious schools or being educated at home. *See* Alaska Stat § 14.45.120; Ark. Stat.Ann. § 80–1503.6(3); Fla.Stat.Ann. § 232.02; La.Rev.Stat.Ann. § 17.236.1 D.(2); N.C.Gen.Stat. § 115C–549; W.Va.

Code § 18–28–3. This is relevant evidence regarding whether Massachusetts could reasonably rely in meaningful measure on the results of such tests. *See Yoder*, 406 U.S. at 226 n. 14, 63 S.Ct. at 1538 n. 14. (In deciding whether the Amish in Wisconsin must be exempted from compulsory education beyond the eighth grade, the Supreme Court relied, in part, on its finding that "an eighth grade education fully satisfies the educational requirements of at least six States.").

In addition, although only addressing the Establishment Clause issues presented by standardized testing, the Supreme Court has indicated that standardized testing is a reasonable means of ensuring that minimum standards of instruction are met by private religious schools. *Wolman v. Walter*, 433 U.S. 229, 240, 97 S.Ct. 2593, 2601, 53 L.Ed.2d 714 (1977); *Committee for Public Religious Liberty v. Regan*, 444 U.S. 646, 653–54, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980). *See also Sheridan Road Baptist v. Department of Education*, 396 N.W.2d 373, 420 (S.Ct.Mich.1986) (Riley, J., dissenting).

Indeed, Dr. Drinkwater acknowledged that if certain standardized tests were properly administered, the results would inform him of whether the subjects tested were being taught at New Life, whether they were being taught as efficiently and thoroughly at New Life as in the East Longmeadow public schools, and whether New Life students were progressing adequately in those subjects. These are, of course, the criteria embodied in M.G.L. c. 76, § 1.

Dr. Drinkwater maintained, however, that approval of New Life is required by the statute. He believes standardized test results would not provide him with all of the information required to decide whether to recommend approval. The court finds, however, that Dr. Drinkwater's requirements for possible approval exceed the state's legitimate interest in education, even as expressed in M.G.L. c. 76, § 1.

Defendants also object to substantial reliance on standardized test results because while such scores may reveal what a stu-

dent knows, they will not disclose where he learned it. Scores might, therefore, mask possible inadequacies in instruction at New Life. The State's legitimate interest, however, is in the student. Focusing on the school may ordinarily be a reasonable, efficient and permissible means of satisfying that interest. Plaintiffs' religious objections to seeking approval make focusing on the school rather than the student a burden on the free exercise of religion in this case. This is not a necessary burden. East Longmeadow can, and therefore must, focus directly on what each student knows and not where he learned it. The state's interest remains in assuring that "all children shall be educated, not that they shall be educated in any particular way." *Roberts*, 159 Mass. at 374, 34 N.E. 402.

As explained in the Findings of Fact, it is feasible for East Longmeadow to follow up in individual cases where the standardized test results it receives suggest that a New Life student is not learning adequately. This follow-up could include discussions with New Life parents and teachers and further testing where indicated. This is a process now pursued in Massachusetts with regard to children who may have learning disabilities.

Once again, the court expects that New Life parents will be responsive to legitimate concerns identified by this process and act to improve their children's education. If parents do not respond in a manner satisfactory to East Longmeadow, it may initiate civil litigation with a view to obtaining an order removing the child from his parents or requiring a specific form of education for the child. *See Care and Protection of Charles & Others*, 399 Mass. at 329, 504 N.E.2d 592.

Defendants also object to relying substantially on test scores because testing is an *ex post facto* means of identifying educational problems. Thus a child might lose a meaningful period of learning before difficulties are disclosed. East Longmeadow's approval process, however, also has an *ex post facto* element because the initial review would take at least two years to complete. Nevertheless, East Longmea-

dow's concern is reasonable. In the view of defendant's expert, Dr. Ryan, a requirement that New Life teachers have a college degree, linked with standardized testing and appropriate follow-up, would address this concern and satisfy the state's interest in the education of New Life students.

Although some witnesses who preceded Dr. Ryan testified briefly on the importance of teachers having college degrees or other academic credentials indicating preparation to teach, the record was not fully developed on this issue. Also, as indicated earlier, since the trial of this case, the Massachusetts Supreme Judicial Court has found that approval of home education should be subject to the same standards as private school approval and has decided that with regard to approving home education, the State may inquire into academic credentials, but not require that parents who teach have college degrees. *Id.* at 331, 339, 504 N.E.2d 592. This suggests that a college degree would be sufficient to establish teacher competency, but that lesser credentials indicating exposure to teaching techniques and relevant subject matter would also be adequate.

It is not necessary or appropriate for this court to decide now whether requiring certain academic credentials in addition to standardized testing and individual follow-up is a component of the least restrictive means for the state to assure that New Life students are adequately educated. The court is persuaded that either tests and follow-up, or such tests, follow-up and an appropriate academic credential requirement, would provide the necessary assurances. Each of these alternatives is a less restrictive means of satisfying the state's interest in the education of New Life students than the East Longmeadow approval process.

In addition, for reasons described in the Establishment Clause analysis which follows, applying one of these alternatives to plaintiffs in place of the approval of New Life contemplated by M.G.L. c. 76, § 1 would not violate the Establishment Clause, largely because either alternative could be implemented by a review of

records rather than by the intensive surveillance, subjective evaluations, and subsequent requirements for reform which are the most entangling aspects of the East Longmeadow approval process.

In view of the foregoing, the East Longmeadow approval process as applied to New Life violates the Free Exercise Clause.[16]

### E.  *The Establishment Clause*

■  The Supreme Court has articulated a three part test for determining whether a statute violates the Establishment Clause. "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster an 'excessive government entanglement with religion.'" *Lemon v. Kurtzman*, 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). Like the analysis required under the Free Exercise Clause, this Establishment Clause test does not authorize a balancing of competing interests. Rather, if a program violates any one of the Establishment Clause prongs the court must strike the program down.

The *Lemon* test provides guidelines, rather than a precise formula, for identifying instances in which the objectives of the Establishment Clause have been impaired. *Meek v. Pittenger*, 421 U.S. 349, 359, 95 S.Ct. 1753, 1760, 44 L.Ed.2d 217 (1975). The Supreme Court has, however:

> particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children. The government's activities in this area can have a magnified impact on impressionable young minds, and the occasional rivalry of parallel school systems offers an all-

too-ready opportunity for divisive rifts along religious lines in the body politic. *Grand Rapid School District v. Ball*, 473 U.S. 373, 105 S.Ct. 3216, 3223, 87 L.Ed.2d 267 (1985).

In this case, the court is satisfied that M.G.L. c. 76, § 1 has a secular legislative purpose and its primary effect neither advances nor inhibits religion. However, the statute as East Longmeadow has sought to apply it to plaintiffs involves an excessive entanglement with religion. Thus, it violates the Establishment Clause.

The first prong of the *Lemon* test is usually satisfied "when a plausible secular purpose for the State's program may be discerned from the face of the statute." *Mueller v. Allen*, 463 U.S. 388, 394–95, 103 S.Ct. 3062, 3067, 77 L.Ed.2d 721 (1983). In this case it is evident that M.G.L. c. 76, § 1 is, in pertinent part, intended to assure that children who attend private schools are adequately educated. This is a well recognized secular purpose. *See, e.g., Mueller*, 463 U.S. at 395, 103 S.Ct. at 3067; *Committee for Public Education* 444 U.S. at 653–54, 100 S.Ct. at 846 (1980). This obvious purpose is also a sincere purpose and not a sham. *See Edwards v. Aguillard*, —— U.S. ——, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham.").

Similarly, M.G.L. c. 76, § 1 does not have the principal or primary effect of either advancing or inhibiting religion. The statute establishes requirements for all children. The requirement that a private school be approved is equally applicable to religious and secular private schools. *See Mueller*, 463 U.S. at 397, 103 S.Ct. at 3068 ("Most importantly the [tax] deduction is available for educational expenses incurred

---

**16.**  As the individual plaintiffs have adequately represented their interests and demonstrated an unwarranted burden on their free exercise rights, it is not necessary for the court to address or decide the apparently unsettled issues of whether New Life as an organization itself has free exercise rights or whether it has standing to assert the free exercise rights of its mem-

bers as their representative. *See* "Developments in the Law—Religion and the State," 100 *Harv.L. Rev.* 1605, 1743 (1987). As indicated in the Findings of Fact, however, it does appear that by burdening the free exercise of religion of present and potential members of New Life, the East Longmeadow approval process has injured the viability of the fledgling New Life church.

by *all* parents, including those whose children attend non-sectarian private schools or sectarian private schools."). In addition, the statute plainly provides that approval shall not be withheld "on account of religious teaching." Thus, M.G.L. c. 76, § 1 on its face satisfies the second prong of the *Lemon* test. No evidence was introduced to contradict this conclusion.

However, M.G.L. c. 76, § 1, as East Longmeadow has sought to apply it to plaintiffs, does not satisfy the third part of the *Lemon* test because it would result in an "excessive entanglement" of the state and religion. This prong of the test is directed at one of the "main evils against which the Establishment Clause was intended to afford protection ... 'active involvement of the sovereign in religious activity.'" *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111 (quoting *Walz v. Tax Commissioner,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)).

It is recognized that "total separation [of church and state] is not possible in an absolute sense." *Lemon,* 403 U.S. at 614, 91 S.Ct. at 2112. Rather, "[s]ome limited and incidental entanglement between church and state authority is inevitable in a complex modern society." *Larkin,* 459 U.S. at 123, 103 S.Ct. at 510. The line between inevitable, incidental entanglement and excessive entanglement is "blurred" and judgments must be made based on "all of the circumstances of a particular relationship." *Lemon,* 403 U.S. at 614, 91 S.Ct. at 2112. More specifically, the court "must look at several factors: the character and purpose of the institution affected, the nature of the activity engaged in by the government, and the resulting relationship between government and the religious organization." *Universidad Central De Bayamon v. National Labor Relations Board,* 793 F.2d 383, 385 (1st Cir. 1985). Consideration of these factors indicates that this case involves characteristics commonly found to constitute excessive entanglement.

With regard to the nature of the institution affected, it is undisputed that at New Life, as in the school in *Lemon,* "religious authority necessarily pervades the school." *Lemon,* 403 U.S. at 617, 91 S.Ct. at 2113; *compare Universidad,* 793 F.2d at 385–88. The thoroughly religious nature of New Life heightens the potential for excessive entanglement in this case.

With regard to the nature of the government activity at issue, the Supreme Court has indicated that the clearest form of excessive entanglement is a program involving a "comprehensive ... continuing state surveillance" of a religious institution, particularly a religious school. *Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114. In a series of cases involving the funding of secular education in religious schools, the Court held that where regular on site inspection of teachers would be necessary to protect the state's interest in assuring that its aid was being used for secular and not sectarian purposes, there would be an excessive entanglement of church and state. *See Aguilar v. Felton,* 473 U.S. 402, 105 S.Ct. 3232, 3258, 87 L.Ed.2d 290 (1985) (on site inspection of public school instructors providing remedial instruction and clinical guidance services in private schools to assure that teachers are providing secular and not sectarian education creates excessive entanglement); *Meek,* 421 U.S. at 349, 95 S.Ct. at 1755 (excessive entanglement because on site surveillance of teachers would be necessary for Pennsylvania to be sure remedial and accelerated instruction and guidance counseling and testing by public school employees in private schools did not advance religious mission of school); *Lemon,* 403 U.S. 602, 91 S.Ct. at 2107.

The Supreme Court's considerable concern for whether a relationship involves continuing surveillance is not, however, limited to direct aid cases. *See Walz v. Tax Commissioner,* 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970) (tax exemption for property owned by religious organization does not violate Establishment Clause in part because it does not involve continuing surveillance); *see also Surinach v. Pesquera de Busquets,* 604 F.2d 73, 78 (1st Cir.1979) (statute empowering public official to regulate private school costs unconstitutional in part because it

entails continuing involvement calling for official surveillance of religious schools).

The constitutional concerns inherent in the continuing surveillance of a religious institution are compounded when this involvement is not an end in itself, but is part of a regulatory scheme likely to lead to official efforts to alter the operations of that institution. *Id.* at 75; *see also Lemon,* 403 U.S. at 621, 91 S.Ct. at 2115 (Court found "no basis for predicting that comprehensive measures of surveillance and controls will not follow"). In this case it is the synergy of the likely continuing surveillance of teaching and the resulting relationship between the School Committee and New Life which causes the court to conclude that East Longmeadow's approval process involves "excessive" entanglement between the state and a religious institution.

East Longmeadow's approval process would not require public school officials to be at New Life every day. Thus, the process is not in this respect as entangling as the programs for monitoring remedial secular education found unconstitutional in *Aguilar* and *Meek.* As described in the Findings of Fact, however, because New Life employs many teachers without college degrees, East Longmeadow officials would in the course of the approval process go into classrooms frequently to observe teaching.

The observation of teaching would not be limited to surveillance of secular instruction. New Life regards the secular and religious aspects of education as inseparable. All subjects are taught from a biblical and fundamentalist Christian perspective.[17] Thus, religious as well as secular instruction would be under surveillance. The teachers being observed would be evaluated by the School Committee. Inherent in this process is the risk that the public officials would in their evaluations, consciously

or unconsciously, be influenced by the religious message as well as by the talents of the messenger.

After observing New Life teaching, the School Committee would suggest improvements it deems necessary in New Life's instructional program and offer assistance in achieving them. The School Committee's decision whether to approve New Life would depend in part on the school's response to its suggestions. Thus, these suggestions are likely to be, in effect, requirements.

It is foreseeable that the School Committee would, either expressly or as a practical matter, require that New Life replace at least some of its teachers with better educated individuals. This would intimately involve the state in the church's educational ministry. The Supreme Court has recognized the "critical and unique role of the teacher in fulfilling the mission of a church-operated school." *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 501, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979); *see also Universidad,* 793 F.2d at 385.

In *Lemon* and its progeny, the "key role" played by teachers in religious elementary and secondary schools was "the predicate for [the Court's] conclusions" that governmental aid to such schools creates an impermissible entanglement between the government and religion. *Catholic Bishop,* 440 U.S. at 501, 99 S.Ct. at 1319. In *Catholic Bishop,* the Court found that Board jurisdiction over faculty—administration relationships in schools permeated with a religious mission would similarly create a significant risk of entanglement. *Catholic Bishop,* 440 U.S. at 502–03, 99 S.Ct. at 1319–20. *Universidad,* 793 F.2d at 385–86.

A comparable risk exists in this case. Indeed, it is magnified because it is predictable that New Life will resist efforts of the state to dictate whom it can hire, thus

---

17. "Even arithmetic can be used as an instrument of pious thoughts, as in the case of the teacher who gave this problem to her class: 'If it takes forty thousand priests and a hundred and forty thousand sisters to care for forty million Catholics in the United States, how many more priests and sisters will be needed to convert and care for the hundred million non-Catholics in the United States?'" *Lemon,* 403 U.S. at 635, 81 S.Ct. at 2122, (Douglas, J., concurring), (quoting Reverend Joseph H. Fichter Parochial School: A Sociological Study 86 (1958)).

generating additional entangling interaction.

Therefore, the nature of New Life, the nature of the East Longmeadow approval process, and the resulting relationship between government and religion indicate that defendants' conduct would foster excessive entanglement between church and state.

The East Longmeadow approval process for New Life did not, of course, progress to the point where the foregoing effects actually occurred. As the Court of Appeals for the First Circuit has said, however:

> It is not the obligation of [a school] to prove as a pre-condition of relief that this precise scenario, which hardly can be called speculative, in fact will unfold. To the contrary, in the sensitive area of First Amendment religious freedoms, the burden is upon the state to show that implementation of a regulatory scheme will not ultimately infringe upon and entangle it in the affairs of a religion to an extent which the Constitution will not countenance.

*Surinach,* 604 F.2d 75–76. *See also Committee for Public Education,* 444 U.S. at 646, 100 S.Ct. at 842–43; *Lemon,* 403 U.S. at 617, 91 S.Ct. at 2113. In this case, defendants have not satisfied this burden. To the contrary, the court is persuaded that the approval process which East Longmeadow has sought to apply to New Life would result in an excessive entanglement of government and religion.

F. *The Alternatives For Assuring That New Life Students Are Adequately Educated Would Not Violate The Establishment Clause.*

As described in the Free Exercise Clause analysis, the court has found that the East Longmeadow approval process is not the least restrictive means of assuring that New Life students are adequately educated. Rather, the court has concluded that there is a less restrictive means of satisfying the state's interest in the education of New Life students. This consists of requiring New Life to provide either (1) information concerning the students, the school, the curriculum; and (2) standardized test results with appropriate individual follow-up or (3) such test results and follow-up coupled with a requirement that each teacher have appropriate academic credentials. Inherent in this finding is the court's conclusion that neither of these alternatives would violate the Establishment Clause.

Accommodating plaintiffs' religious beliefs by using a special alternative to the East Longmeadow approval process for them does not represent strict neutrality of the government toward religion. There is, in this respect, a certain tension between the Free Exercise and Establishment Clauses. However, the Supreme Court

> has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause. *See e.g., Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (judicial exemption of Amish children form compulsory attendance at high school); *Walz v. Tax Comm'n,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (tax exemption for churches).

*Hobbie,* 107 S.Ct. at 1051; *see also Thomas,* 450 U.S. at 719–20, 101 S.Ct. at 1432–33; *Sherbert,* 374 U.S. at 409, 83 S.Ct. at 1797. In this case, neither of the possible less restrictive alternatives would create excessive entanglement or otherwise violate the Establishment Clause.

The Supreme Court has in several cases found that the Establishment Clause is not violated when the State provides standardized tests to be administered to private religious school students. In *Wolman,* the Supreme Court approved the validity of spending public funds to furnish standardized tests and scoring services to religious schools. 433 U.S. at 238–41, 97 S.Ct. at 2600–01. In reaching this conclusion, the Court found that the state has a substantial interest in insuring that its youth receive an adequate secular education and that providing standardized tests to religious schools was an acceptable means of assuring that minimum standards of instruction were being met. *Id.* In addition, the court went on to find explicitly that

"the inability of the school to control [the content] of the test eliminates the need for the supervision which gives rise to excessive entanglement." *Id.* at 240–41, 97 S.Ct. at 2601; *see also id.* at 261, 97 S.Ct. at 2612–13 (Marshall, J., concurring).

The Supreme Court reached the same result regarding standardized tests in *Committee for Public Education and Religious Liberty v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980). In *Regan* provision of the tests was approved because the "New York plan calls for tests that are prepared by the State and administered on the [private school] premises by nonpublic school personnel. The nonpublic school thus has no control whatsoever over the content of the tests." 444 U.S. at 654, 100 S.Ct. at 847.

In the funding cases, however, the Supreme Court apparently only considered the entanglement caused by the supervision necessary to assure that state funds are not being used for tests that promote religious purposes. When the test is devised by the state, there is no need for supervision to assure that the funds have paid for a test with religious content. In the instant case, the question of supervision has another dimension. State control of the content of the test does not negate the need for supervision when, as here, the state is concerned about whether the private school will administer the standardized tests properly, as is required for the results to be reliable. The question remains, therefore, whether the supervision needed to assure that proper standardized testing conditions exist creates an excessive entanglement between church and state.

The court finds that the supervision required to assure standardized testing conditions does not involve excessive entanglement. The supervision necessary to monitor test conditions is not the type of continuing, comprehensive surveillance the Supreme Court has found objectionable. East Longmeadow could rely on New Life to administer the standardized tests. It could also engage an independent contractor to give the tests at New Life or have them administered to New Life students in the public schools.

These alternatives would require interaction between New Life students and East Longmeadow representatives no more than once or twice a year. This type of interaction is qualitatively different than the type of surveillance needed to assure that teachers are not injecting a sectarian message into their secular classes or that teachers are competent. A sectarian message cannot be prevented without having an overseer attending classes on a daily basis. *Lemon,* 403 U.S. 602, 91 S.Ct. at 2107; *Aguilar,* 105 S.Ct. at 3238. Similarly, individualized evaluation of teacher competency as envisioned by the East Longmeadow approval process involves a type of in depth personal surveillance and subjective evaluation not presented by an exam procter. Thus, the surveillance necessary to assure that test conditions are proper is not excessively entangling.

If a student's standardized test scores are adequate, East Longmeadow's involvement with that child and his family will be ended for that year. If the test scores are not satisfactory to East Longmeadow, they may be followed up by further testing and meetings between East Longmeadow officials, the child's parents, and possibly his teachers.

For the reasons described in detail in the Findings of Fact, the court is persuaded that New Life parents share the state's interest in having their children adequately educated and are likely to be responsive to documented concerns about the adequacy of their children's education. Thus, the court expects that at least most New Life parents would willingly participate in consultations with East Longmeadow concerning their children's test results and would agree to further testing when it was indicated. The Supreme Court has held that providing diagnostic testing, counseling and remedial services, when furnished at a neutral site, does not violate the Establishment Clause. *Wolman,* 433 U.S. at 243, 247–48, 97 S.Ct. at 2605; *see also Meek,* 421 U.S. at 368 n. 17, 371 n. 21, 95 S.Ct. at 1764–65 n. 17, 1766 n. 21.

The court also expects that at least most New Life parents would respond to significant problems identified by the testing process. They would likely respond by causing New Life to improve the education it offered, by transferring their child to another fundamentalist Christian school, or by placing their child in another school equipped to address their child's educational needs, as did the parents of one New Life third grader identified as having a learning disability.

If a child's parents did not take the steps necessary to satisfy the Town that the child would be adequately educated either at New Life or elsewhere, litigation seeking an order relating to the child's education or custody could be commenced. Litigation would, of course, be a form of intense involvement between parents and the state. It would, however, be predicated upon demonstrated educational problems arising in individual cases. It would not be the result of a general clash between the routine performance of a governmental function and the religious beliefs of a group. In any event, the court expects that litigation will rarely be required.

As described earlier, it is neither necessary nor possible on the present record for the court to decide now whether a requirement that each New Life teacher have satisfactory academic credentials is a component of the least burdensome means of assuring that New Life students are adequately educated. It should be recognized, however, that the Supreme Court has suggested that requiring teachers to have certain academic credentials would not violate the Establishment Clause. *Board of Education v. Allen*, 392 U.S. 236, 245–46, 88 S.Ct. 1923, 1927–28, 20 L.Ed.2d 1060 (1968) (state may require that private school employ teachers of specified training, among other things, if attendance at that school is to satisfy state compulsory-attendance laws); *Wolman*, 433 U.S. at 240, 97 S.Ct. at 2601. Implicit in the Supreme Court's statements that a state may consider the credentials of private school teachers is the understanding that whether a teacher has required academic credentials is ascertainable from a review of records. It need not

involve the intensive surveillance required to evaluate a teacher's performance in the classroom which East Longmeadow's approval process would entail in the circumstances of this case. Nor would it entail the subjective evaluations and recommendations which are part of the East Longmeadow approval process.

## IV. FUTURE PROCEEDINGS

The plaintiffs have prevailed in this case by proving that they are entitled to declaratory and injunctive relief. In their complaint, plaintiffs also request monetary damages, to which they may now also be entitled. No evidence on this issue, however, was offered at trial. Thus, it will be necessary that the parties confer and inform the court of their views on whether it is necessary or appropriate for the court to hold future proceedings on the issue of damages.

In addition, as plaintiffs have established a violation of their constitutional rights for which 42 U.S.C. § 1983 provides a remedy, they may be entitled to payment of their costs and reasonable attorneys' fees under 42 U.S.C. § 1988. The parties must also confer and inform the court of their positions on this issue.

## V. CONCLUSION

■ For the reasons described in detail in this opinion, M.G.L. c. 76, § 1, as East Longmeadow has sought to apply it to plaintiffs in this case, violates the Free Exercise and Establishment Clauses of the First Amendment of the United States Constitution. Thus, defendants must be enjoined from applying this approval process to plaintiffs. In addition, the state must be enjoined from enforcing M.G.L. c. 71, § 2 by prosecuting Mr. Romero, as a parent of a New Life student, for his failure to send his child to a public school or an approved private school.

The state, however, continues to have a compelling interest in assuring that New Life students are adequately educated. The court has not sought to decide precisely how East Longmeadow must deal with

plaintiffs in part because of a "recognition that courts are not school boards or legislatures, and are ill-equipped to determine the 'necessity' of discrete aspects of a State's program of compulsory education." *Yoder*, 406 U.S. at 235, 63 S.Ct. at 1543. In addition, there may be more than one constitutionally acceptable way for the state to discharge its duties in this case.

At this point, defendants must determine in light of this decision how they will attempt to satisfy in a constitutionally permissible manner the state's important interest in assuring that the children who attend New Life are adequately educated. The plaintiffs will have to respond to this effort. As indicated at the outset, if the parties proceed in the spirit of tolerance and respect for the integrity of each other's views which inspired the First Amendment, a mutually acceptable accommodation should be attainable. If they do not, further litigation may be inevitable.

VII. ORDER

In view of the foregoing, the court hereby declares that M.G.L. c. 76, § 1, as defendants have sought to apply it to plaintiffs, violates the First Amendment of the Constitution of the United States. It is, therefore, hereby ORDERED that:

1. Defendants are permanently enjoined from applying to plaintiffs the approval process at issue in this case;

2. Defendants are permanently enjoined from prosecuting plaintiff Richard Romero, as a parent of a student at New Life Academy, pursuant to M.G.L. c. 71, § 2, for failure to send his child to a public school or to an approved private school;

3. The parties shall confer and inform the court by September 18, 1987 of their positions concerning awards of monetary damages, costs and reasonable attorneys fees and the related issues, if any, which they believe must be resolved in connection with those matters.